Salvatore DiMARTINO,

v.

CITY OF HARTFORD and George W. Sicaras, Chief of Police.

Civ. No. H–81–637(MJB).

United States District Court, D. Connecticut.

May 23, 1986.

Robert W. Heagney, Gilman & Marks, East Hartford, Conn., for plaintiff.

Richard M. Cosgrove, Deputy Corp. Counsel, Hartford, Conn., for defendant.

## RULING ON DEFENDANT CITY OF HARTFORD'S MOTION FOR SUMMARY JUDGMENT

BLUMENFELD, Senior District Judge.

Salvatore DiMartino brought this action in 1981 against the defendants, former Po-

lice Chief George Sicaras and the City of Hartford, alleging that they failed to reinstate him to the Hartford Police Force because of his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634 (1976 & Supp. IV 1980). Following a period of discovery and negotiations between the parties, the attorneys for DiMartino and the City of Hartford drafted and signed a "Settlement Agreement" in which DiMartino agreed to withdraw this action in return for certain concessions on the part of the City of Hartford relating to DiMartino's effort to gain reinstatement. DiMartino personally signed that agreement on November 6, 1984. Defendant City of Hartford now moves for summary judgment claiming that the settlement agreement validly compromised the instant action, and that the City of Hartford fully performed its promises under the agreement, thereby barring the plaintiff from pursuing this ADEA claim. DiMartino contests the enforceability of the settlement agreement under the terms of the ADEA, and further contends that he signed the agreement under duress, that the agreement was void for lack of consideration, and that the City of Hartford never fully performed its obligations as agreed. This case raises the question of the appropriate law to apply in evaluating the validity of compromises of actions brought under the ADEA.

### I. *The Facts*

Except where indicated, the following facts are not in dispute.

The plaintiff, Salvatore DiMartino, was born on January 16, 1929. He joined the Hartford Police Force as a patrolman in 1953. In 1962, while directing traffic in an intersection, DiMartino was struck by an automobile and injured his knee. DiMartino reinjured his knee while on police duty in 1966. Claiming a twenty percent permanent partial disability, DiMartino applied to the Employee Pension Commission for the City of Hartford for permission to retire from the police force with a service-connected disability pension. The commission informed him that he could retire with a "special disability allowance," which is designed for a municipal employee with sufficient length of service "who suffers a permanent [job-related] disability which does not prevent him from engaging in gainful employment" apart from his job duties with the city. DiMartino retired from the police force in May 1967 and began collecting his pension allowance of approximately $3650 per year. He was 38 years old at the time.[1]

In June 1980, believing himself to be rehabilitated, DiMartino requested reinstatement as an officer with the City of Hartford. DiMartino claims that he was denied reinstatement and was told that the reason for the denial was that he was too old.

On August 27, 1981, DiMartino filed this action in federal court. Apparently as a result of the filing of this suit the City of Hartford gave DiMartino a medical examination in September 1982 to determine if he was physically qualified to be rehired. The examining physician determined that he was not qualified because of faulty vision and high blood pressure, and because he had a history of both major joint surgery and spinal column surgery.

DiMartino continued to pursue his claim. Following a period of discovery the parties engaged in settlement negotiations. In the spring of 1984, Aaron Slitt, one of DiMartino's attorneys at the time, and Marie Cone of the City of Hartford's Office of Corporation Counsel, reached a tentative agreement to settle the DiMartino case. Attorney Cone drafted a "Settlement Agreement" and mailed it unsigned to Attorney Slitt.[2] In the proposed agreement DiMarti-

---

**1.** DiMartino is still receiving his pension allowance. The special disability status has permitted him to obtain private employment while receiving benefits.

**2.** The Settlement Agreement reads in full:

SETTLEMENT AGREEMENT
BETWEEN
SALVATORE DiMARTINO
AND
CITY OF HARTFORD

no agreed to withdraw his lawsuit in exchange for the opportunity to take and pass all examinations necessary to become an entry-level police officer.

For reasons unexplained Attorney Slitt did not immediately sign and return the agreement. Several months later, on October 23, 1984, Slitt sent a letter to Attorney Cone proposing a modification of the proposal that would have permitted DiMartino to be reinstated as an officer commensurate with his experience, rather than as a probationary recruit. Attorney Cone rejected the modification.

Shortly thereafter Slitt signed the draft of the original proposal that had been mailed to him and returned it to Cone. According to Slitt, DiMartino was present when Slitt signed the agreement, and consented to his signature. According to DiMartino, he was not aware that Slitt signed the agreement or that he sent it to Cone.

On November 6, 1984, Attorney Cone telephoned Slitt and requested his permission to ask DiMartino to add his signature to the settlement agreement. Slitt gave her that permission, and Cone immediately phoned DiMartino and asked him to come to her office. DiMartino arrived a few minutes later. He was presented with the agreement signed by Slitt, with the addition of a space typed in for DiMartino's signature. He signed and dated the agreement in the presence of Attorney Slitt and Bernard Sullivan, the Chief of Police at

that time. Attorney Cone also signed the agreement that day.

Pursuant to the settlement agreement, on December 20, 1984 the City of Hartford Health Department gave DiMartino a physical examination to determine whether he was qualified for the position of police officer. The following day the City's Department of Personnel sent DiMartino a letter informing him that he was not qualified to be a police officer because of excessive weight and high blood pressure.

DiMartino was subsequently allowed an appeal of his disqualification in accordance with the City's personnel regulations. DiMartino was informed by a letter dated January 8, 1985 that his appeal was denied.

## II. *Analysis*

■ Where the parties to a dispute have entered into a valid settlement agreement to pending litigation, that agreement will be enforced by the court. *See, e.g., National Lawyers Guild v. Attorney General,* 94 F.R.D. 592, 599 (S.D.N.Y.1982). A valid settlement agreement will be held to bar those parties on the underlying claim. *Aro Corporation v. Allied Witan Co.,* 531 F.2d 1368, 1371 (6th Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976). Courts may enforce such agreements summarily. *See, e.g., National Lawyers Guild v. Attorney General,* 94 F.R.D. at 597 n. 2; *Cia Anon Venezolana de Navegacion v. Harris,* 374 F.2d 33 (5th Cir.1967).

---

The City of Hartford and Salvatore DiMartino hereby agree:

1) The City of Hartford agrees to allow Mr. DiMartino to submit to the testing process for police officer. This process will include submitting to the medical and polygraph tests, background check, and oral interview with the Police Chief. The City agrees to waive the requirement of the written test.

2) Upon successful completion of these tests, background check, interview and pending enrollment in a class at the Municipal Police Training Academy, Mr. DiMartino would be hired to attend Municipal Police Training Academy for the training class. Upon successful completion and graduation from the Academy, Mr. DiMartino would be allowed to start as a twelve-month probation-

ary officer with the Hartford Police Department.

3) In the event Mr. DiMartino graduates from the Academy and is hired as a probationary officer with the Hartford Police Department, he agrees to a waiver of any preexisting medical condition.

4) Mr. DiMartino agrees to withdraw his pending Commission on Human Rights and Opportunities complaint and Civil Action No. H81–637 pending in United States District Court. He further agrees to provide the City with a release of any and all claims relating to his attempts to be rehired by the Hartford Police Department.

5) The above agreement constitutes the entire settlement and is inclusive of attorneys' fees.

In this case the settlement agreement at issue was validly signed by attorneys for the plaintiff and the City of Hartford, and was separately signed by the plaintiff himself. That alone would normally be sufficient for an award of summary judgment against plaintiff. Here, however, plaintiff raises several challenges to the agreement on statutory and common law grounds. These are (1) that such agreements to settle age discrimination suits are unenforceable and void under the terms of the ADEA, (2) that the settlement agreement is void for lack of consideration, (3) that the City of Hartford failed to perform its promises under the agreement thereby excusing the plaintiff from his promise to withdraw the suit, and (4) that the plaintiff was under duress when he signed, thereby permitting him to void the contract.

## A. *The Statutory Challenge*

■ DiMartino initially challenges the validity of the settlement agreement by claiming that the Age Discrimination in Employment Act flatly bars private settlements of age discrimination claims. He bases this argument on the interrelationship between the ADEA and the Fair Labor Standards Act of 1938 (FLSA), which sets nationwide standards governing minimum wages and overtime pay for employees in interstate commerce. 29 U.S.C. §§ 206, 207; *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 698–99, 65 S.Ct. 895, 898, 89 L.Ed. 1296 (1945). Section 7(b) of the ADEA, 29 U.S.C. § 626(b), provides that the rights created by the ADEA are to be "enforced in accordance with the powers, remedies and procedures of" specified sections of the FLSA. *See Lorillard v. Pons*, 434 U.S. 575, 579, 98 S.Ct. 866, 869, 55 L.Ed.2d 40 (1978); *Goodman v. Heublein, Inc.*, 645 F.2d 127, 129 (2d Cir.1981). DiMartino points out that one of these specified FLSA sections, section 16(b), has been interpreted by the Supreme Court to prohibit settlements of FLSA wage claims, even where the employee and employer

have agreed to compromise a bona fide dispute over the amount of wages legally owed. *Schulte, Inc. v. Gangi*, 328 U.S. 108, 114–16, 66 S.Ct. 925, 928–29, 90 L.Ed. 1114 (1946); *Brooklyn Savings Bank v. O'Neil*, 324 U.S. at 707–14, 65 S.Ct. at 902–06. DiMartino claims that by incorporating FLSA "powers, remedies and procedures," section 7(b) of the ADEA also incorporates the FLSA's strict prohibition against settlement.[3] This court disagrees.

The Supreme Court had occasion to consider the scope of the ADEA's incorporation of FLSA procedures in *Lorillard v. Pons*, 434 U.S. at 577–83, 98 S.Ct. at 868–72, where the Court held that the ADEA incorporates the FLSA's right to a trial by jury. In that case the Court observed that Congress modeled the ADEA on Title VII of the Civil Rights Act of 1964, the FLSA, and other existing statutes. *Id.* at 578, 98 S.Ct. at 868. In the process the ADEA became "something of a hybrid, reflecting, on the one hand Congress' desire to use an existing statutory scheme ... and, on the other hand, its dissatisfaction with some elements of each of the preexisting schemes." *Id.* at 578, 98 S.Ct. at 868. The Court pointed out that section 7(b) of the ADEA evidenced Congress' desire to broadly incorporate many of the FLSA procedures, including the right to a jury trial. *Id.* However, Congress also exhibited "a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation," *id.* at 581, 98 S.Ct. at 870, by expressly modifying certain FLSA practices. *Id.* at 582, 98 S.Ct. at 871. The end result was "selectivity" in the incorporation of FLSA enforcement procedures. *Id.* at 582, 98 S.Ct. at 871; *Vasquez v. Eastern Air Lines, Inc.*, 579 F.2d 107, 110 (1st Cir.1978).

The strict prohibition against the release of claims is one FLSA feature Congress clearly intended to abandon in passing the ADEA. During hearings on the ADEA congressional committees "emphasized that

---

3. The only case the plaintiff cites in support of this reading of ADEA section 7(b) is *Runyan v. National Cash Register*, 759 F.2d 1253 (6th Cir. 1985). This case was subsequently granted a rehearing en banc by the Sixth Circuit. The cited opinion was vacated. *Id.*

the most favored method of enforcement was conciliation and mediation." *Rogers v. Exxon Research and Engineering Co.*, 550 F.2d 834, 841 n. 11 (3d Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978) (citing S.Rep. No. 723, 90th Cong. 1st Sess. 5 (1967)). Congress expressed a preference for "the administrative process, avoidance of litigation and prevention of 'overanxiety' on the part of American business." *Dean v. American Security Ins. Co.*, 559 F.2d 1036, 1038 n. 7 (5th Cir.1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978) (citing, *inter alia,* 113 Cong.Rec. 31254 (Nov. 6, 1967) Remarks of Senator Javits). This theme of conciliation rather than litigation is reflected in the congressional statement of purpose included at the outset of the ADEA:

> It is ... the purpose of this chapter to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; *to help employers and workers find ways of meeting problems arising from the impact of age on employment.*

29 U.S.C. § 621(b) (emphasis supplied); *see also* H.R.Rep. No. 805, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.Code Cong. & Ad. News 2213, 2218 (expressing intention that ADEA enforcement "be initially and exhaustively directed through informal methods of conciliation, conference and persuasion [with] formal methods applied only in the ultimate sense").

In sharp contrast to the ADEA scheme, Congress designed the FLSA with an eye towards an inflexible protection of the employee's right to unpaid wages. Where the ADEA expresses a preference for working out compromises between the interests of an employer and his elderly employee, the FLSA contemplated an "all or nothing gamble," in which the employee, for his own protection, is prevented from bargaining away his legal claim to disputed wages:

> Congress evidently felt it should not provide for variable compensation to fit the degree of blame in each [FLSA] infraction. Instead Congress adopted a mandatory requirement that the employer pay a sum in liquidated damages equal to the unpaid wages so as to compensate the injured employee for the retention of his pay.
>
> It is realized that this conclusion puts the employer and his employees to an "all or nothing gamble," as Judge Chase phrased the result in his dissent below. Theoretically this means each party gets his just deserts, no more, no less. *The alternative is to find in the Act an intention of Congress to leave the adjustments to bargaining at the worst between employers and individual employees or at best between employers and the employees' chosen representatives, bargaining agent or some other.* We think the purpose of the Act, which we repeat from the *O'Neil* case was to secure for the lowest paid segment of the Nation's workers a subsistence wage, leads to the conclusion that neither wages nor the damages for withholding them are capable of reduction by compromise of controversies over coverage. Such a compromise thwarts the public policy of minimum wages, promptly paid, embodied in the [FLSA], by reducing the sum selected by Congress as proper compensation for withholding wages.

*Shulte, Inc. v. Gangi*, 328 U.S. at 115–16, 66 S.Ct. at 928–29 (citing *Brooklyn Savings Bank v. O'Neil*, 324 U.S. at 704–05 n. 14, 65 S.Ct. at 900–01 n. 14) (footnotes omitted) (emphasis supplied).

It is evident that a wholesale incorporation of the FLSA's scheme for the settlement of disputes would work at cross-purposes to the intentions expressed by Congress in passing the ADEA. A more appropriate model for ADEA settlements is provided by Title VII of the Civil Rights Act of 1964. In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1973) the Supreme Court held that in judging the effectiveness of a settlement of an employee's discrimination action under Title VII "a court would have to determine at the outset that the employee's consent to the settlement was voluntary

and knowing." *Id.* at 52 n. 15, 94 S.Ct. at 1021 n. 15. The Court also held that an employee did not "voluntar[ily]" waive his Title VII claim by submitting his discrimination dispute to a labor arbitrator pursuant to a collective bargaining agreement then in effect between the union and employer. *Id.*

Subsequent federal court decisions have expanded on the ruling in *Gardner-Denver.* These cases have held that the existence of a "voluntary and knowing" waiver depends upon the presence or absence of a number of relevant factors, including whether the employee who purportedly released his claim was at the time actively represented by an attorney, *Pilon v. University of Minnesota,* 710 F.2d 466, 467–68 (8th Cir.1983); *Mosley v. St. Louis Southwestern Railway,* 634 F.2d 942, 946 (5th Cir.1981), whether the settlement agreement was in writing, *Lyles v. Commercial Lovelace Motor Freight, Inc.,* 684 F.2d 501, 503–04 (7th Cir.1982), and, if so, whether the agreement was ambiguously worded. *Cox v. Allied Chemical Corp.,* 538 F.2d 1094, 1097–98 (5th Cir.1976); *but see Perez v. State of Maine,* 760 F.2d 11, 14 (1st Cir.1985).

Several reasons lead one to conclude that Congress intended that this Title VII scheme, rather than the FLSA scheme, be applied to releases of ADEA claims. It is well known that Title VII provides the model for the substantive provisions of the ADEA, *Lorillard v. Pons,* 434 U.S. at 584, 98 S.Ct. at 872, and that the ADEA and Title VII "share a common purpose, the elimination of discrimination in the workplace." *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979). In addition, "[c]ooperation and voluntary compliance were selected as the preferred means for achieving this goal" under Title VII, *Alexander v. Gardner-Denver Co.,* 415 U.S. at 44, 94 S.Ct. at 1017, as well as under the ADEA.

These common purposes are reflected in a common scheme for achieving the goal of voluntary compliance. Each Act empowers the Equal Employment Opportunity Commission (EEOC) to serve as a primary enforcement authority for the rights provided in its substantive provisions.[4] *See* 42 U.S.C. § 2000e–5; 29 U.S.C. § 626(b). Each Act establishes a procedure whereby existing state and equal opportunity agencies, as well as the EEOC, are given an opportunity "to eliminate" the discriminatory practice through "informal methods of conference, conciliations and persuasion" before the aggrieved party is permitted to file a lawsuit. 42 U.S.C. § 2000e–5(b); 29 U.S.C. §§ 626(b), (c); *Alexander v. Gardner-Denver Co.,* 415 U.S. at 44, 94 S.Ct. at 1017.

These similarities in statutory structure, language and purpose "are a strong indication that the two statutes should be interpreted *pari passu.*" *Northcross v. Memphis Board of Education,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973); *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *Oscar Mayer & Co. v. Evans,* 441 U.S. at 756, 99 S.Ct. at 2071. Moreover, by preventing all but "voluntary and knowing" releases of ADEA claims, as well as Title VII claims, Congress properly struck a balance between, on the one hand, the statutory purpose of encouraging voluntary compliance with the mandates of the Act, and, on the other hand, Congress' often-expressed concern that an employee acting without informed assistance, or at least neutral supervision, might freely bargain away to his employer the substantive rights that these and similar acts are designed to protect. *See Dice v. Akron, Canton & Youngstown Railroad Co.,* 342 U.S. 359, 361–62, 72 S.Ct. 312, 314–15, 96 L.Ed. 398 (1952) and *Duncan v. Thompson,* 315 U.S. 1, 6–7, 62 S.Ct. 422, 424, 86 L.Ed. 575 (1942) (Federal Employer's Liability Act); *Schulte, Inc. v. Gangi,* 328 U.S.

---

**4.** Congress originally vested the ADEA's primary enforcement authority with the Secretary of Labor, but otherwise modeled the enforcement scheme on Title VII. Pursuant to Reorganiza- tion Plan No. 1 of 1978, Section 2, 43 F.R. 19807, 92 Stat. 3781, these functions were transferred from the Secretary of Labor to the EEOC.

at 115–16, 66 S.Ct. at 928–29 (FLSA); *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 246–48, 63 S.Ct. 246, 251–52, 87 L.Ed. 239 (1942) (Merchant Marine (Jones) Act).

In sum, the ADEA permits an employee to release his age discrimination claims only when his consent to a settlement of his claim is "voluntary and knowing," as so defined for Title VII cases in *Alexander v. Gardner-Denver Co.* and its progeny.

Applying these Title VII principles there is no question that this case meets the initial statutory threshold of a "voluntary and knowing" waiver as previously defined by the federal courts. It is undisputed that the terms of the settlement agreement were the product of several months of negotiations between the attorneys for the parties, *Pilon v. University of Minnesota*, 710 F.2d at 467–68; *Mosely v. St. Louis Southwestern Railway*, 634 F.2d at 946; that the agreement was reduced to a writing, signed by the attorneys for each side, and signed by the plaintiff himself, *Lyles v. Commercial Lovelace Motor Freight, Inc.*, 684 F.2d at 503–04; and that the agreement unambiguously delineates the obligations of each party, *Cox v. Allied Chemical Co.*, 538 F.2d at 1097–98. DiMartino instead bases his challenge to the settlement on several common law defenses to the enforcement of a contract. These will be examined next.

### B. *The Common Law Defenses*

■ Before evaluating DiMartino's common law defenses to the enforcement of the settlement agreement it must first be determined whether state or federal law applies to this case. Where, as here, a case deals with the operation of a federal statutory scheme and the language of the statute does not fully identify the relevant law to be applied, federal courts are competent to fill the interstices and fashion the appropriate rules. *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943); *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207,

1209 (5th Cir.1981); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 888–89 (3d Cir.1975); *see* Field, *Sources of Law: The Scope of Federal Common Law*, 99 Harv.L.Rev. 881, 909–11 (1986). A court must determine whether the void is to be filled by incorporating state law, or by applying an independent federal doctrine. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–28, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979); *Clearfield Trust Co. v. United States*, 318 U.S. at 367, 63 S.Ct. at 575; *see* Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules of Decision*, 105 U.Pa.L.Rev. 797, 802–04 (1957). In all such cases "[w]hether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.' " *United States v. Kimbell Foods, Inc.*, 440 U.S. at 728, 99 S.Ct. at 1458 (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947)); *see also D'Oench Duhme & Co. v. F.D.I.C.*, 315 U.S. 447, 471–72, 62 S.Ct. 676, 685–86, 86 L.Ed. 956 (1942) (Jackson, J., concurring).

Among the purposes of the ADEA are the "employment of older persons based on their ability rather than age," and the elimination of "arbitrary age discrimination in employment." 29 U.S.C. § 621(b); *Lorillard v. Pons*, 434 U.S. at 577, 98 S.Ct. at 868; *Dillman v. Combustion Engineering, Inc.*, 784 F.2d 57, 59 (2d Cir.1986). To these ends, the Act sets up uniform nationwide standards for the hiring and discharge of the elderly. 29 U.S.C. §§ 623, 631. It follows that the federal rights that the ADEA provides "could be defeated if states were permitted to have the final say as to what defenses could and could not be properly interposed to suits under the Act." *Dice v. Akron, Canton & Youngstown Railroad Co.*, 342 U.S. at 361, 72 S.Ct. at 314 (release of rights under Federal Employer's Liability Act (FELA) governed by federal rather than state law). Moreover,

"no significant state interest would be served by absorbing state law as the rule of decision" regarding ADEA settlement agreements. *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d at 1209 (federal law controls the validity of settlement of Title VII actions). It is evident that the federal interest in a uniform application of an independent federal rule for the validity of settlements under the ADEA outweighs any state interest in applying a local rule of decision. *See* Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision*, 105 U.Pa.L.Rev. at 814–20.

In choosing such independent federal rules "federal courts are free to apply the traditional common law techniques of decision and to draw upon all the sources of common law in cases such as the present." *D'Oench Duhme & Co. v. F.D.I.C.*, 315 U.S. at 472, 62 S.Ct. at 686 (Jackson, J., concurring). However, the particular rule selected must be "appropriate to effectuate the policy of the governing Act." *Id.*

Historically, federal courts have consistently applied general principles of contract in determining the validity of the release of rights under federal statutes dealing with the employer-employee relationship. *See, e.g., Maynard v. Durham & Southern Railway Co.*, 365 U.S. 160, 161–63, 81 S.Ct. 561, 562–63, 5 L.Ed.2d 486 (1961) (release of rights under FELA void for lack of consideration); *Callen v. Pennsylvania Railroad Co.*, 332 U.S. 625, 630, 68 S.Ct. 296, 298, 92 L.Ed. 242 (1948) (doctrine of mutual mistake applied to FELA release); *Dice v. Akron, Canton & Youngstown Railroad Co.*, 342 U.S. 359, 362, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952) (fraudulently obtained release invalid under FELA); *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942) (release of rights under Jones Act requires consideration and must be obtained without duress, fraud or misrepresentation); *Duncan v. Thompson*, 315 U.S. 1, 7–8, 62 S.Ct. 422, 424–25, 86 L.Ed. 575 (1942). Nothing in the ADEA suggests that these same common law principles are not applicable

here as well. Therefore, in evaluating the plaintiff's common law challenges to the enforceability of the settlement agreement, the court will draw upon general principles of common law as applied in similar cases. *See D'Oench Duhme & Co. v. F.D.I.C.*, 315 U.S. at 471–72, 62 S.Ct. at 685–86.

### 1. *Consideration*

DiMartino's initial common law challenge to the settlement agreement is that it is void for lack of consideration. In order that there may be consideration in exchange for the release of a legal claim "there must be mutual concessions." *Maynard v. Durham & Southern Railway Co.*, 365 U.S. at 163, 81 S.Ct. at 563 (quoting *Burns v. Northern Pacific Railway Co.*, 134 F.2d 766, 770 (8th Cir.1943)). A release is not supported by sufficient consideration unless something of value is received to which the creditor had no previous undisputed right. *Id.* A bona fide compromise of a disputed legal claim will provide sufficient consideration for the release of that claim. *Geisco, Inc. v. Honeywell, Inc.*, 682 F.2d 54, 57 (2d Cir.1982).

In this case there is no doubt that the settlement agreement between DiMartino and the City of Hartford included mutual concessions. In the settlement DiMartino "agree[d] to withdraw" his pending federal court suit, and any related claims against the defendants, in exchange for two specific concessions on the part of the City of Hartford. The most important of these was that DiMartino would be "allow[ed] to submit to the testing process" for the position of probationary police officer. The testing process included a medical examination administered by the City of Hartford and other required tests to determine whether he was eligible to enroll in the police academy to become a probationary police officer. A second concession in the agreement exempted DiMartino from taking the normally-required written test.

DiMartino admits that the settlement agreement contains these concessions, but claims that they do not amount to suffi-

cient consideration for his promise to withdraw the suit. The gist of his argument is that he received nothing in the settlement to which he did not already have a right, in that the City of Hartford would have permitted any similarly qualified but inexperienced applicant to take the examinations necessary to become a probationary police officer.

DiMartino's claim that he had such a preexisting right to take these exams is disingenuous. Whether DiMartino had any right at all to even apply for the position of probationary police officer had been a matter of bona fide dispute in this litigation. Throughout the litigation the City had contended that DiMartino's medical condition had disqualified him for any police service. To support its contention the City pointed to a similar medical examination it gave to DiMartino in 1982, which he failed. In contrast to the City's position, DiMartino claimed the right to full reinstatement to his previous rank with back pay, arguing that he was the victim of age discrimination.

In this light it is clear that the settlement agreement reached, which permitted DiMartino to take a second medical exam and otherwise compete for a position as an entry-level police officer, constituted a bona fide compromise of contrasting positions on the merits of this case. Adequacy of consideration turns not on whether a party received as much as he might have had he litigated the dispute and won, "but, rather, whether he received something of value to which he was not already unquestionably entitled." *Runyan v. NCR Corp.*, 573 F.Supp. 1454, 1460 (S.D.Ohio 1983); *Schmitt-Norton Ford, Inc. v. Ford Motor Co.*, 524 F.Supp. 1099, 1103 (D.Minn.1981), *aff'd*, 685 F.2d 438 (8th Cir.1982). In this case the settlement agreement was based upon fair and adequate consideration and mutual concessions from the parties' prior positions. *See Maynard v. Durham & Southern Railway Co.*, 365 U.S. at 163, 81 S.Ct. at 563. It is therefore a bona fide compromise of a bona fide dispute.

## 2. *The Medical Examination*

 DiMartino next asserts that the City did not in good faith provide him with the medical examination as the settlement agreement implicitly required it to do, and claims that because it did not comply with its end of the bargain the City cannot now seek to enforce DiMartino's promise to withdraw his suit.

Whatever the legal merits of his argument, DiMartino has not offered any facts from which it may be inferred that the City failed to provide him a fair medical examination. DiMartino was given a full examination on December 20, 1984, in which it was determined that he did not medically qualify as a police officer for reasons of high blood pressure, faulty vision, and excessive weight for his height and build. In accordance with City regulations he was permitted to appeal his disqualification and have another physician review the records of the examination. He did. On appeal a physician confirmed his disqualification.

DiMartino's only serious challenge to the medical examination is that the City failed to follow its own written standards in determining that DiMartino's weight exceeded the maximum allowed for his height and body build. However, DiMartino's own submissions indicate that the City's weight standards were properly applied. The City's medical reports from his December 20 examination indicate that DiMartino weighed 186 pounds at that time. The reports also reveal that he was 5'8¼" tall and that he had a "medium" body frame. As the City of Hartford regulations indicate that a person of DiMartino's height and build had to weigh no more than 176 pounds to qualify to become a police officer, DiMartino was properly disqualified on the basis of excessive weight.

## 3. *Duress*

DiMartino's final attempt to avoid enforcement of the settlement rests upon his claim that he signed the agreement under duress. The modern rule regarding duress is that any wrongful act or threat which overcomes the free will of a party in agree-

ing to a contract will permit the party to avoid the contract. *Austin Instruments, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971); *Kaplan v. Kaplan,* 25 Ill.2d 181, 185, 182 N.E.2d 706 (1962). While "free will" is typically viewed as a question of "whether the will of a particular person has been overcome," where the coercion involves economic pressure rather than the threat of physical injury there must be some objective showing that a "reasonable person would be put in fear" of the consequences to the extent that his will would be overcome. Calamari & Perillo, *Law of Contracts 2d* § 9–2 at 262 (1977). *See also Restatement of Contracts 2d* § 175 at 475–76 (1981) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.").

Where the threat is economic rather than physical this circuit has likewise adopted objective criteria for evaluating the legal sufficiency of a party's attempt to avoid a contract for duress. In *Vines v. General Outdoor Advertising Co.,* 171 F.2d 487, 490 (2d Cir.1948) (Learned Hand, J.), the court held on a motion for summary judgment that the alleged victim of duress had not brought forth facts sufficient to send the case to a jury where the victim was threatened with repudiation of a preexisting contractual obligation if he did not enter into a new contract with the party making the threat. The court relied upon the following rule:

> The law of duress has indeed been much extended; "it is inconsistent with the modern theory of duress to assert as an infallible rule that threatened repudiation of contractual obligation cannot amount to duress." Still, it is certainly the law in New York, and probably elsewhere, that, if an obligee has adequate legal remedies, the obligor's threat to repudiate the debt, unless the obligee will enter into the contract, will not *"without more"* avoid it. This is also the law in federal courts.

*Id.* at 490 (citing *Hartsville Oil Mill v. United States,* 271 U.S. 43, 49, 46 S.Ct. 389, 391, 70 L.Ed. 822 (1926) and *Silliman v. United States,* 11 Otto 465, 101 U.S. 465, 470–71, 25 L.Ed. 987 (1879)) (footnotes omitted). Applying this rule to the case at hand, the court found:

> [T]here was nothing in the plaintiff's testimony to suggest that he was in such exiguous circumstances that, if he did not accept the new terms, the defendant's repudiation would put him in want or prevent him from successfully collecting the debt. His responsibilities do not appear, and he had been earning an income as the defendant's salesman since 1922; and was probably in a position to get employment elsewhere .... Since it was his burden to show something "more" than the threat to repudiate, the judge was therefore right in believing that on his own statement he had not made out a case.

*Id.*

██ The instant action falls within the rule stated in *Vines.* In his affidavits DiMartino avers that "[b]efore signing the settlement agreement [he] was informed by [his attorneys] that the Corporation Counsel for the City of Hartford indicated that [his] disability pension may be cancelled," and that "this threat distorted [his] ability to fairly evaluate the settlement agreement." Even assuming that such a statement made by one attorney to another during the course of settlement negotiations amounts to an "improper threat," and that the "threat" actually induced DiMartino to sign the settlement agreement, DiMartino's bare assertion of coercion is not enough to make out a case of duress. As in *Vines* there is nothing in DiMartino's affidavits "to suggest that he was in such exiguous circumstances" that, if he did not accept the settlement, the City of Hartford's cancellation of his disability pension "would put him in want or prevent him from successfully collecting" the pension. *Vines v. General Outdoor Advertising Co.,* 171 F.2d at 490. In his affidavit DiMartino admits that he was not solely dependent on earnings from the pension. Moreover, it is

uncontested that he was represented by two attorneys at the time, who certainly were aware of the alleged "threat," as it was made to them, and who could have adequately contested any improper attempts to cancel his pension. In sum, DiMartino has failed to carry his burden "to show something 'more' than the threat to repudiate" in a situation where he had ready access to "adequate legal remedies" to the opposing party's threatened conduct. *Id.*

■ Furthermore, even if it were assumed that DiMartino was under duress when he signed the agreement, his behavior following his signing amounts to a ratification of the agreement:

> [A] contract entered into as the result of duress is not void, but merely voidable, and is capable of being ratified after the duress is removed. Ratification results if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or void it.

*Gallon v. Lloyd-Thomas Co.,* 264 F.2d 821, 826 (8th Cir.1959); *Restatement of the Law of Contracts* §§ 499 and 484; 13 *Williston on Contracts 3d* § 1624 at 772–76 (1970). It is undisputed in this case that after signing the agreement on November 6, 1984, DiMartino did nothing to avoid it until after he was informed on January 8, 1985, that he failed the medical examination and would not be reinstated as a police officer. By then the City of Hartford had performed all its obligations under the terms of the settlement. During the intervening period DiMartino had ample opportunity to ask his lawyers to contest the settlement, but instead chose to take his chances in the hope that the settlement would work to his favor. Under general principles of contract such behavior amounts to a ratification as a matter of law. *Gallon v. Lloyd-Thomas Co.,* 264 F.2d at 826.

### III. *Conclusion*

In this case the City of Hartford has supported its motion for summary judgment with evidence of a valid settlement agreement, signed by the plaintiff and his attorney, that on its face requires the plaintiff to withdraw this federal court action. Where, as here, a motion for summary judgment is made and supported with affidavits and other submissions as required by Rule 56(c), the party opposing the motion may not rest upon the "mere allegations or denials of his pleadings," *S.E.C. v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978), but instead must set forth "concrete particulars" to establish the existence of an issue of material fact. *Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96 (1970). The plaintiff has failed to do so in this case with respect to his various challenges to the enforceability of the settlement agreement. Therefore, the motion for summary judgment is granted.

SO ORDERED.