**J.R. VALLE, Plaintiff**

v.

**JOHNSON CONTROLS WORLD SERVICES, INC. and T. Lamar Nowland, Defendants.**

**Civil Action No. 1:95cv367GR.**

United States District Court, S.D. Mississippi, Southern Division.

July 18, 1996.

conspiring to cause the wrongful termination of [Patterson] from ... her employment:" Complaint, ¶ 55 (emphasis in original).

Joseph G. Albe, New Orleans, LA and Dale Edward Williams, Metairie, LA, for Plaintiff.

Armin J. Moeller, Jr., David M. Thomas, II, Aubry Matt Pesnell, Phelps Dunbar, Jackson, MS, and Kevin E. Hyde, Amy W. Littrell and Charles C. Lemley, Foley & Lardner, Jacksonville, FL, for Defendants.

## MEMORANDUM OPINION AND ORDER

GEX, District Judge.

This cause is before the Court on motion for summary judgment filed by the defendants pursuant to Federal Rule of Civil Procedure 56 [24–1]. Also before the Court is the plaintiff's opposition to the ruling by Magistrate Judge John M. Roper, denying his motion for leave to file a third amended complaint as untimely [49–1], and the defendant's motion to dismiss the plaintiff's second amended complaint [40–1]. After due consideration of the parties' briefs, the applicable law, and being otherwise fully advised in the premises, the Court finds, as set forth below, that the defendants' motions for summary judgment and to dismiss should be granted, and the plaintiff's motion to set aside the magistrate judge's order denied.

### Statement of Facts

The plaintiff, J.R. Valle, began his professional relationship with the defendant, Johnson Controls World Services, Inc. [Johnson Controls], in March or April 1990, when he was hired as a contract civil services engineer. Defs.' Mot. for Summ.J., Exh. A, p. 46. Johnson Controls has a contract with the National Aeronautics and Space Administration [NASA] to provide logistics, support, and engineering services at the Stennis Space Center in Hancock County, Mississippi. Johnson Controls entered into a contract relevant to this action in 1989. The contract calls for successive one-year renewal periods until 1997. *Id.*, Exh. B, p. 46; Exh. F, ¶ 3. The scope and amount of services Johnson Controls provides varies each year according to the work requested by NASA and the appropriations NASA receives from Congress. *Id.*, Exh. F, ¶ 3.

During the time Valle was employed, the engineering services division of Johnson Controls was arranged into three departments: design, drafting, and test engineering. Valle was employed in the design department, which has three components: civil, mechanical, and electrical. Within the civil division there is a lead engineer, a senior engineer, and numerous engineers. *Id.* at ¶ 4. Valle was hired as a regular employee on November 21, 1991. *Id.*, Exh. A, p. 53. Although Valle had the lowest seniority date at Johnson Controls, he was not eligible to serve as a senior engineer or lead engineer because he was not a licensed professional engineer, or "P.E." *Id.* at 128, Exh. F, ¶ 5. Valle was not a P.E. because he had not successfully passed the Engineer-in-Training, or E.I.T. exam. *Id.*, Exh. A, pp. 44, 128.

Bill Kennedy supervised Valle for approximately twelve months during the time he worked as a contract civil engineer. *Id.* at 52. Kennedy did not perform any formal performance rating of Valle but testified that Valle's engineering work was "generally unreliable" and "inaccurate." *Id.*, Exh. D, pp. 23–24. In March 1991, Kennedy was replaced by another engineer, Alex Christie, who supervised Valle temporarily until the arrival of Margaret "Meg" Adams on July 21, 1991, who was hired by Johnson Controls as a lead engineer and supervisor. *Id.*, Exh. D, p. 36.

Valle testified that Christie made the following derogatory remarks about his national origin on five or more occasions: "These ... Puerto Ricans are all alike. They are not good for nothing." *Id.*, Exh. A, pp. 71–72. Valle further testified—presumably at a time when he was not Valle's supervisor—that Christie had told a small group of employees that "as soon as he become the new supervisor of the civil group he was going to get rid of that bastard hispanic engineer." *Id.* at 166. Christie testified admitting that he had said in jest that all Puerto Ricans looked alike and that Valle reported it. Christie further testified that he did not make the comment more than once, that he did not use profanity, and that he apologized to Valle

when the matter was brought to his attention. *Id.*, Exh. E, p. 81. Valle and Christie dispute whether the "look alike" comment was made at a time when Christie was his supervisor. Christie testified that he was not his supervisor when the comment was made, *id.* at 82, but Valle testified that Christie made the comments on two occasions while he was his supervisor. *Id.*, Exh. A, p. 72.

After Adams supervised Valle for one year, she completed a performance evaluation for Valle in July 1992. *Id.*, Exh. A–2. Valle was evaluated in areas of job performance on a scale of one to five, with one being the lowest, and five the highest, score. *Id.* Valle received an overall score of three, or "meets expectations," receiving a score of two or "marginal" in written communications, with the added comment, "[n]eeds significant improvement in written communication, including report writing." *Id.* The evaluation further noted, *inter alia*, that Valle needed to "enhance structural engineering aptitude," "improve[ ] written communication skills," and "enroll[ ] in a writing course, or English proficiency course." *Id.* Valle wrote the following comment: "I do not agree with comments in 'enhance structural engineering aptitude.'" *Id.* Valle testified, however, that he agreed to enroll in a writing course or English proficiency course and filled out an application for funding. *Id.*, Exh. A, p. 81.[1]

In October 1992, Lamar Nowland, was transferred to the Stennis Space Center as manager of engineering services. *Id.*, Exh. B, pp. 42, 46. Nowland testified that he was hired with the mandate that he improve the quality of work provided by Johnson Controls. Nowland had received complaints from NASA that the quality of work produced by the company's engineers was inferior and that NASA's engineers had to verify much of the work performed by Johnson Controls' engineers. *Id.* at 44, 72–73; Exh. F, ¶ 2. To achieve the objective of improving the quality of the engineers' work, Nowland developed a system called "peer review," which required a lead engineer to sit down

---

1. Valle testified that his application for funding, which had been approved, was later turned down by defendant Lamar Nowland, *infra*. *Id.*, Exh. A, pp. 81–82.

with an engineer, review the engineer's drawings, discuss any mistakes, and take corrective action to avoid similar mistakes in the future. *Id.*, Exh. B, pp. 73–74. The goal of peer review was to make "continuous progress toward minimizing the errors." *Id.* at 73. Initially, Nowland implemented the peer review system through Dave Marshall, the design manager (subsequently replaced by Bob Wanslow), and Valle's immediate supervisor. *See id.*, Exh. F, ¶ 6. Nowland testified as follows:

Q. Okay, so your peer review system should have caught these errors, is that right?

A. Well, it should have started us on a road of, shall I say, continuous progress toward minimizing the errors. What I found is I was getting a lot of internal resistance because the engineers didn't want their work checked by anybody, quite literally. They wanted to continue the same old systems. Most of us are somewhat resistant to change.

Q. How would the, for instance, in J.R. Valle's case, he would have reviewed his work under the peer review system the way you—

A. The way I envisioned it, I called the lead engineers. In this case, or in J.R.'s case, Meg Adams, together along with the other leads, and I said, "You three are the P.E.'s that I've got in the sections." I said, "You are the ones I am chartering to minimize your section's mistakes. I expect you to take the lead and be responsible for your section's work."

So I'm not going to say it's just general error. I'm going to Dave Marshall and I'm expecting Dave to go to you three because you are my quality process, if you will. I think that was a new direction for the engineers—for the leads.

Prior to that time, they had been basically doing work load scheduling, handing the project off and then somewhat superficially monitoring it from a scheduling perspective, but not getting really involved in the technical details. I started seeing a little more involvement slow-

ly, but that's something that I felt I needed to do, and I had to push.

*Id.*, Exh. B, pp. 73–74. Nowland further explained that the peer review process was necessary because Kirk Miller at NASA had emphasized that he "was tired of being your checker." *Id.* at 75.

In March 1993, with the peer review process in place, Valle was reprimanded for plagiarism, insubordination, and poor written communication skills. The reprimand stemmed from a traffic control evaluation technical report for NASA which Valle had been assigned to write. *Id.*, Exh. A, p. 87. Valle completed a draft of the report and presented it to Adams for review. Up to that time, Nowland testified that Valle had performed satisfactorily on projects that had been assigned to him. *Id.*, Exh. B, p. 73. Adams reviewed the report and determined that it contained numerous grammatical and substantive deficiencies. *Id.*, Exh. F, ¶ 7. Additionally, Adams believed that a substantial portion of the report had been plagiarized from other sources because the writing style contained in the report was not similar to other work Valle had done. *Id.* Adams later reviewed the rough draft Valle had given to the secretaries for typing and saw that photocopies from other work had been "cut and pasted" directly to the manuscript Valle had prepared. *Id.* Adams instructed Valle to rewrite the report and not to submit it to the NASA engineering department without her approval. *Id.;* Exh. A, pp. 88–90; Exh. B, pp. 77–79. Despite this order, as obliquely conceded by Valle, *id.*, Exh. A, pp. 90–91, Valle presented the report to Richard Rider, the head of NASA's engineering department. *Id.*, Exh. F, ¶ 7; Exh. G, p. 18. When Adams learned that Valle had submitted the report without her approval, she asked Rider to return it to her before he reviewed it because she had determined that the product was deficient. *Id.*, Exh. G, pp. 18–19. Rider testified that he then told Adams, *inter alia*, "I will do whatever I feel like," that it wasn't a big issue to him (Rider) as it was to Adams, and that he (Rider) saw deficient products "all the time." *Id.*, Exh. G, pp. 18–19.

Adams reported the incident to Nowland. Nowland convened a fact-finding board consisting of himself and Christie to review Valle's actions. *Id.,* Exh. B, pp. 76–77. Following the investigation by the board, including an interview with Adams and Valle, Nowland issued a letter of reprimand to Valle. *Id.,* A–4 (dated 3/10/93). In the letter, Nowland determined that Valle had not intended to plagiarize the report, but that his conduct in giving the report to Rider was "clear, flagrant insubordination with the intent to circumvent her authority." *Id.* Nowland determined that "further actions of this nature will not be tolerated and will result in immediate discharge." *Id.* Additionally, Nowland cautioned Valle as follows:

> Of perhaps more long term concern to me[,] however, is your continuing difficulty with the written reports. Meg Adams, your supervisor, has had to do major rewrites on most of your prior work. You even stated that what you expected and desired on this one was to "get Meg to help me." My evaluation is that the problem is much deeper than just minor editing help—you have a significant inability to master the written report which comprises at least 30% of your job requirements. I do not feel [Johnson Controls] can continue your employment when you cannot perform satisfactorily 30% of your job. It is my intent to allow you to finish jobs currently assigned without giving you new work requiring major written skills after which time your employment will be terminated.

*Id.*

On August 12, 1993, Valle filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that he was being terminated because of his age (59) and "my national origin and race (Honduras/Hispanic)." *Id.,* Exh. F–1. Valle stated, *inter alia,* the following in his charge:

> My native language is Spanish and English is my second language. I have been advised that my employment will end September 3, 1993, when I will be terminated. The stated reason for the termination is that I do not use English very well in my

written reports. I reject this as being untrue.

*Id.* Nowland testified that John Embry, Johnson Controls' manager of human resources, and Keith Humphries, the general manager of the company's NASA project, investigated Valle's charge and noted that a previous application by Valle to obtain funding for a written communications course had been denied by Nowland for lack of funds. *Id.,* Exh. B, pp. 86–87. The dispute was resolved by allowing Valle to remain employed, provided that he enroll in courses to improve his written communication skills. *Id.* Nowland wrote the following to Valle in a letter dated August 20, 1993:

> On 10 March 1993 you were issued a letter indicating my intent to terminate your employment at a future date due to lack of writing skills. On 4 August I verbally communicated a final date of 3 September. Further investigation by Human Resources has revealed prior attempts by you to gain company assistance to attend courses regarding your writing skills which were disapproved for lack of funding. It is my understanding that you intend to pursue this and I will personally see to it that such courses are approved.
>
> The intent to terminate your employment is hereby rescinded. I look forward to working with you in the future.

*Id.,* Exh. A–5.

In October 1993, Nowland received an anticipated scope of work and budget appropriation that the engineering department would receive from NASA for the fiscal year 1994, beginning October 1, 1993, and extending through September 30, 1994. Nowland determined that the projects for which NASA would hire Johnson Controls would decrease. Accordingly, Nowland determined that a reduction in force of the engineers was necessary. Humphries directed that two major reductions were required. The first reduction involved the elimination of up to seven positions as a consequence of "near certain budget cuts." *Id.,* Exh. B, pp. 89–90; Exh. F, ¶ 12. The second reduction would include up to three additional positions which were positions of "lesser certainty of being lost due to the imposed budget restrictions." *Id.*

On October 13, 1993, Nowland met with Wanslow, Dennis Horne, and Charles Pittman, the heads of the three engineering departments at NASA, for the purpose of devising a system for evaluating the positions and engineers to be eliminated in the work force reduction. Nowland, Wanslow, Pittman, and Horne devised a matrix of the following factors to consider in evaluating the engineers: (1) *Time* (1 point per year of service; maximum 10 points); (2) *Performance* (last appraisal weighted by changes since last report; maximum 35 points); (3) *Teamwork* (attitude, cooperation, team effectiveness; maximum 20 points); and (4) *Value/Job Knowledge* (average–10, strong–15, specialist–20, expert–25; maximum 25 points); (5) *Protected Class* (all or none, 10 points). *Id.,* Exh. F, ¶ 13; Exh. F–2. The employees evaluated were classified into the following principal work groups: electrical, mechanical, civil, and spares. *Id.,* Exh. F–2.

The first reduction in the engineering department, which occurred in November 1993, involved employees working in separately funded or non-engineering positions. Janice Byrd, a five-year planner who was not an engineer and not evaluated on the matrix, was released. *Id.,* Exh. F, ¶ 15. Her duties were assumed by NASA. *Id.* Holly Mollyneux, a design engineer working in the spares program,[2] had a matrix score of 42, the lowest of any engineer in that group. Mollyneux was terminated. *Id.,* Exh. F, ¶ 15; Exh. F–2. A temporarily funded position for new engineers was also eliminated, resulting in the termination of Maurice Heidelberg, an engineer so employed. *Id.*[3] The employment of Wendy Schlesinger, a clerk, and Ed Garside, a non-degree engineer, was terminated. *Id.,* Exh. F, ¶ 15.

In his affidavit, Nowland attested that he determined that one electrical engineer and one mechanical engineer were to be eliminated in addition to Mollyneux and Heidelberg. *Id.* at ¶ 16. Accordingly, Fred Vaughn, a mechanical engineer (with a score of 56), and

Len Soellers, an electrical engineer (with a score of 48), were terminated. *Id.* Nowland further attested that design engineers were evaluated within their own discipline, i.e., civil engineers were compared to civil engineers. *Id.* at ¶ 17. The civil engineers, in order of ranking, were evaluated as follows:

(1) Tom Murray—80/100;

(2) Carl Williams—67/100;

(3) Bill Kennedy—66/100;

(4) Dreux Seghers and Al Genin (tie)—55/100; and

(5) J.R. Valle—54/100.

*Id.;* Exh. F–2. Although Valle received the lowest score of all the civil engineers who were rated, Nowland explained that Valle was not included in the first work force reduction because Johnson Controls had committed in August 1993 to give Valle time to take communication classes so he would have the opportunity to improve his written communication skills. *Id.,* Exh. B, p. 94; Exh. F, ¶ 18. Although Seghers was slated for termination, the termination was delayed when additional funds were obtained to permit Seghers to work as a project engineer in the test stand complex. *Id.,* Exh. F, ¶ 18; Exh. G, pp. 20–21. Consequently, Genin, with a matrix score of 55, was terminated in the first work force reduction of November 1993. *Id.,* Exh. B, p. 94; Exh. F, ¶ 18.

Nowland received the final budget appropriations for the engineering department in January 1994. Based on this information, Nowland determined that an additional civil engineer position had to be eliminated. *Id.,* Exh. F, ¶ 19. In his affidavit, Nowland explained as follows:

[Johnson Controls'] engineering budget comes from nine sources and is best visualized in terms of manyears of contract requirement rather than dollars. At the end of [fiscal year] FY 1993, the Engineering Services Division summary reflected a total manpower ceiling of 77.83 manyears for

---

**2.** Apparently, the spares program was a separately funded work group.

**3.** In Johnson Controls' brief and affidavit, Heidelberg's name was spelled, "Heidleberg." However, in Exhibit F–2, a handwritten document indicates the name to be "Heidelberg,"

which the Court treats as the correct spelling in this proceeding. *Id.,* Exh. F–2. A similar discrepancy occurs in the spelling of Mollyneux, which was also spelled as "Molyneux" in the decision matrix. *See id.*

FY [19]93. In January[ ] 1994[,] the FY 1994 contract ceiling had been set at 69.93, or approximately a 10% reduction. Specifically, the civil design requirement[ ] of 5.09 manyears in FY 1993 had been reduced to 2.93 manyears in FY 1994. The first cut of Al Genin in November[ ] 1993 had brought the civil engineers on board to 4.0 manyears. This had to be further reduced in January[ ] 1993 to 3.0 manyears in the civil engineering crew to meet contract requirements. Based on the appropriation I determined that an additional civil engineer position needed to be eliminated.

*Id.* The remaining civil engineers were Tom Murray, Carl Williams, Valle, and Tom Knight. *Id.* Knight, a lead engineer, was not considered in the reduction process. *Id.* Nowland attested that he did not initially consider Valle for termination the second time around because he had not yet taken classes to improve his writing skills. Nowland further attested that Valle had been approved and funded for a college level writing course in January 1994, but had not followed through with registration or attending classes. *Id.,* ¶ 20.

Knight, Valle's direct supervisor at the time, protested to Wanslow and Nowland that Valle should be considered for reduction as well as Murray and Williams. *Id.* Knight testified that he was "furious." *Id.,* Exh. C, p. 31. When questioned why he was furious, Knight testified, *inter alia,* as follows:

A. Because I felt like it was being dictated to me what tools I was going to be allowed to retain and utilize to perform a job that was in my area of responsibility, and that my input should be a factor in the decision making process.

Q. So you thought that J.R. Valle should have been let go?

A. No, I didn't know who should be let go at that time.

Q. Okay.

A. I suggested to Bob Wanslow—in fact, I strongly encouraged Bob Wanslow that we rank each candidate for—that was a candidate for reduction, that it be based on experience, qualifications, and capabilities, against our projected workload.

Q. Okay.

A. And retain the ones that were most qualified and capable to help us, and to let go the one that was the least essential—

Q. Okay.

A. —to meeting our future workloads.

Q. You had three engineers working for you, and at that time, you didn't have any idea who was the most qualified and the most capable?

A. I wouldn't say I didn't have any idea, but I pretty much knew, performance-wise, who were the higher performers.

*Id.* at 31–32; *see also id.* at 38.

As set forth above, in the previous matrix, the engineers had been rated as follows: Murray, 80; Williams, 67; and Valle, 54. Nonetheless, Wanslow devised a new rating matrix, providing for zero points for poor or unobserved, one point for satisfactory, and two points for good. *Id.,* Exh. C, pp. 31–32, 38; Exh. C–1. Wanslow, with Knight's concurrence, *id.,* Exh. C, p. 50, rated the three engineers as follows:

|  | VALLE | WILLIAMS | MURRAY |
| --- | --- | --- | --- |
| EDUCATION | Civil Engineer; Mechanical Engineer | Civil Engineer | Civil Engineer |
| E.I.T. | No | Yes | Yes |
| Professional Engineer (P.E.) | No | No | Yes |

Capabilities:

| | | | |
|---|---|---|---|
| Structural | ? | ? | 2 |
| Civil | 1 | 2 | 1 |
| Utilities | 2 | 2 | 1 |
| Architectural | 0 | ? | 1 |
| Studies | 0/1 | 2 | 2 |
| Communication | 0/1 | 2 | 2 |
| OVERALL EVALUATION | 3/5 | 8 | 9 |

*Id.*, Exh. C–2.

According to the Wanslow–Knight matrix, Valle was the lowest rated engineer. When questioned regarding Valle's unobserved/unknown rating with regard to structural engineering, Knight testified, *inter alia*, that he had never had an opportunity to work with Valle "in a structural application." *Id.*, Exh. C, p. 50. The matrix was presented to and approved by Nowland, who then recommended to Humphries that Valle be terminated. *Id.*, Exh. F, ¶ 20. Following Humphries' approval, Nowland informed Valle on February 17, 1994, that Valle's employment would be terminated effective March 4, 1994. *Id.* Nowland attested that, after Valle's termination, the workload was distributed among the remaining engineers. *Id.* Of the nine employees terminated from the engineering services division during the two work force reductions, one was Hispanic (Valle), one was black (Heidelberg), and seven were white (Mollyneux, Byrd, Genin, Soellers, Vaughn, Schlesinger, and Garside). *Id.*, Exh. F, ¶ 21. Overall, forty employees were laid off by Johnson Controls from September 1, 1993, to the date that Valle was terminated. *Id.*

On February 21, 1994, Valle filed a charge of discrimination with the EEOC, contending that he was terminated unlawfully on the basis of age, race, and national origin. Valle filed his original petition against Johnson Controls in Louisiana state court on December 16, 1994, which was amended on April 17, 1995. The EEOC issued a right-to-sue letter on February 3, 1995. The defendants re-moved the case to the Eastern District of Louisiana, which was subsequently transferred to this Court on July 6, 1995.

*Standard of Review*

A grant of summary judgment is appropriate when, viewed in the light most favorable to the nonmoving party, "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Adcock v. International Paper Co.*, 809 F.Supp. 457, 459 (S.D.Miss.1992) ("[s]ummary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists"). As noted by the Fifth Circuit,

If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting [summary judgment] is proper. On the other hand, if reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, [summary judgment] should be denied, and the case submitted to the jury. A mere scintilla is insufficient to present a question for the jury. However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

The Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion [summary judgment].

*Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115, 117–18 (5th Cir.1993) (citation omitted).

### Legal Analysis

#### I. Discrimination on the Basis of Race/National Origin

▌ In his second amended complaint, the plaintiff, J.R. Valle, alleges, *inter alia*, that his termination was the result of unlawful discrimination on the basis of national origin, in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1). Under Title VII, Congress provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individuals race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). "The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff." *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (citation and internal quotation omitted).

▌ Although an "employer" as defined by Congress includes the employer's agents, *see* 42 U.S.C. § 2000e(b), a manager or supervisor can never be individually liable under Title VII to pay damages for actions taken in his supervisory capacity. *See, e.g., Garcia v. Elf Atochem North America*, 28 F.3d 446, 451 n. 2 (5th Cir.1994); *Grant v. Lone Star Co.*, 21 F.3d 649 (5th Cir.), *cert. denied*, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994).[4] Valle concedes, as he must, that his Title VII claims against Nowland in his individual capacity should be dismissed. Moreover, the parties have stipulated to that effect. Accordingly, the Court finds that Valle's Title VII claims against Nowland in his individual capacity should be dismissed.

▌ "To succeed on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff must first prove a *prima facie* case of discrimination." *Wallace v. Texas Tech University*, 80 F.3d 1042, 1047 (5th Cir.1996). To establish a *prima facie* case of discrimination in a situation involving a reduction of work force[5], the plaintiff must show the following:

(1) The employee is a member of a protected class;

(2) The employee was qualified to assume another position at the time of discharge;

(3) Based on record evidence, circumstantial or direct, a factfinder might reasonably conclude that the employer intended to discriminate against the employee in reaching the decision.

*Molnar*, 986 F.2d at 118 (Age Discrimination in Employment Act [ADEA] case).[6]

---

4. The same applies to Valle's putative ADEA claim, addressed on an alternative basis below. *See Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir.1996) (holding that, as reasoned by *Grant*, the ADEA provides no basis for individual liability for supervisory employees).

5. One court provides the following definition of a work force reduction:

It is important to clarify what constitutes a true work force reduction case. A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.) (citation omitted), *cert. denied*, 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990).

6. Case law addressing discrimination claims pursuant to the ADEA generally applies to cases under Title VII. *See Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir.1995) ("The same evidentiary procedure for allocating burdens of proof applies to discrimination claims under both statutes"). Similarly, the Eighth Circuit observed that, "[b]ecause the prima facie case standards in Title VII cases and those in ADEA cases are substantially similar, we con-

For purposes of Rule 56, Johnson Controls concedes that the plaintiff has met his burden in establishing a *prima facie* case of discrimination. Defs.' Mem. in Supp. of Mot. for Summ. J., at 14. In support thereof, the defendant asserts the following facts:

> Valle is hispanic; he was at least nominally qualified for the civil engineering position he held; he was discharged from employment; and Tom Murray and Carl Williams—neither of whom are in a protected class—were retained as civil engineers after Valle was discharged. Murray and Williams assumed the duties of Valle.

*Id.* Having established a *prima facie* case, "[t]he burden of production then shifts to the defendant to articulate a legitimate [nondiscriminatory] reason for the adverse employment decision." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). If the defendant succeeds in establishing a legitimate nondiscriminatory reason for the adverse employment action, the defendant destroys the presumption raised by the plaintiff's *prima facie* case. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 & n. 10, 101 S.Ct. 1089, 1095 & n. 10, 67 L.Ed.2d 207 (1981).

This, however, does not dispose of the lawsuit. The plaintiff is then afforded the opportunity and "burden of showing that these reasons were pretextual." *Molnar*, 986 F.2d at 118 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. "A plaintiff may demonstrate pretext directly by showing that a discriminatory motive more likely motivated the employer or indirectly by showing that the employer's explanation is unworthy of credence." *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 813 (5th Cir.1991) (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). "[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 516, 113 S.Ct. at 2752; *Marcantel v. Louisiana*, 37 F.3d 197, 200 (5th Cir.1994).[7]

Because Title VII complaints generally involve complex and disputed facts, summary judgment is often an inappropriate method of adjudicating such claims. In *Thornbrough v. Columbus and Greenville R. Co.*, 760 F.2d 633 (5th Cir.1985), the Fifth Circuit provides the following:

> In reviewing a motion for summary judgment, the court must indulge every reasonable inference from the underlying facts in favor of the party opposing the motion. The party who defended against the motion for summary judgment must have his allegations taken as true and must receive the benefit of the doubt when his assertions conflict with those of the movant. In general, summary judgment is an inappropriate tool for resolving claims of employment discrimination, which involve nebulous questions of motivation and intent. Often, motivation and intent can only be proved through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder.

*Id.* at 640–41 (citations and internal quotations omitted). Nonetheless, there are situations when summary judgment is an appropriate tool for disposing of Title VII claims.

---

clude that the rationale of the Title VII cases should extend to the present [ADEA] case as well." *Rinehart v. City of Independence, Mo.*, 35 F.3d 1263, 1266 (8th Cir.1994) (citation and internal quotation omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995).

7. The Supreme Court noted in *Hicks* that the "unworthy of credence" language in *Burdine* should not be read to allow a finding of unlawful discrimination simply because the statement is unbelievable. Rather, the falsity or incredulity of the explanation is only "auxiliary" evidence. *Hicks*, 509 U.S. at 515–19, 113 S.Ct. at 2752–53. As made clear by *Aikens*, the ultimate question is whether actual discrimination occurred. *See Aikens*, 460 U.S. at 714, 103 S.Ct. at 1481. Therefore, the issue is whether "the presumptively valid reasons for [the plaintiff's discharge] were in fact a coverup for a ... discriminatory decision." *Hicks*, 509 U.S. at 517–19, 113 S.Ct. at 2753 (citation and internal quotation omitted).

As recently observed in an *en banc* decision by the Fifth Circuit:

> The evidence necessary to support an inference of discrimination will vary from case to case. A jury may be able to infer discriminatory intent in an appropriate case from substantial evidence that the employer's proffered reasons are false. The evidence may, for example, strongly indicate that the employer has introduced fabricated justifications for an employee's discharge, and not otherwise suggest a credible nondiscriminatory explanation.
>
> *By contrast, if the evidence put forth by the plaintiff to establish the prima facie case and to rebut the employer's reasons is not substantial, [the trier of fact] cannot reasonably infer discriminatory intent.* [*See* Deborah C. Malamud, *The Last Minuet: Disparate Treatment After Hicks*, 93 MICH.L.REV. 2229, 2308 (1995) ("There may be cases in which the [prima facie case and proof of pretext] goes the plaintiff's way, but a judgment for the plaintiff would still be legally questionable.") In some cases, for instance, the fact that one of the nondiscriminatory reasons in the record has proved highly questionable may not be sufficient to cast doubt on the remaining reasons. Likewise, an employer's explanation for its proffer of a pretextual reason may preclude a finding of discrimination. *See Woods v. Friction Materials*, 30 F.3d 255, 261 n. 3 (1st Cir. 1994) (concluding that a jury could not infer age discrimination if the employer's articulated nondiscriminatory reason was that the employee lacked necessary work skills, but that the employer's real reason was to conceal its own acts of embezzlement); *Binder v. Long Island Lighting Co.*, 57 F.3d 193, 200 (2nd Cir.1995) ("Such an explanation might include, for example, protection of a business secret or even protection of the reputation of an employee who had engaged in undesirable conduct.").

*Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 994 (5th Cir.1996) (*en banc*) (ADEA case) (emphasis added).

■ Johnson Controls contends that remarks remote in time are not sufficient to show that Valle's termination was the result of unlawful discrimination. Defs.' Mem. in Supp. of Mot. for Summ. J., 19. In the context of an ADEA claim, the Fifth Circuit recently provides the following:

> [A]ge-related remarks ... may serve as sufficient evidence of age discrimination if the offered comments are: 1) age related; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue, and 4) related to the employment decision at issue. Comments that are "vague and remote in time" are insufficient to establish discrimination. In contrast, specific comments made over a lengthy period of time are sufficient.

*Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir.1996) (footnotes omitted). "[R]emarks remote in time or made by those down the employer's hierarchy are alone insufficient to establish age discrimination." *E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1093 n. 2 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995).

■ Applying the above standard to Valle's Title VII and section 1981 claims, the Court finds that the record does not support Valle's allegation that his termination was based on unlawful discrimination. Of course, Christie's comments regarding Puerto Ricans, whether in jest or otherwise, referred to Valle's national origin or race. Although Christie's alleged but disputed comment that he would fire Valle when has was in the position to do so allows an inference of discriminatory intent, Valle's claim collapses in light of other factors relevant to the inquiry. It is undisputed that Christie did not terminate Valle. Nor was he in a position to do so. It is undisputed that Christie voluntarily resigned his employment with Johnson Controls in August or September 1993, at least two months before the first evaluation of the engineers and six months before Valle was actually terminated. Defs.' Mot. for Summ. J., Exh. E, p. 43; Exh. F, ¶ 22.

Valle does not show, in light of substantial evidence to the contrary presented by Johnson Controls, that Christie influenced Nowland's decision to terminate him. Valle's

technical writing problems and his resistance to the peer review process is well established in the record. *See Molnar*, 986 F.2d at 119. Although not alone determinative,[8] Nowland's decision to reprimand Valle was based on Valle's insubordination, plagiarism, and writing problems, which were brought to Nowland's attention by Adams, not Christie. Although Valle testified that he reported Christie's discriminatory comment to Adams and others, Defs.' Mot. for Summ. J., Exh. A, p. 84, Valle does not articulate that Adams discriminated against him in any manner. In fact, Valle testified that "Adams was a very practical person and very, very good follower of the rules." *Id.* at 84. Christie's involvement in the fact finding session, without more, does not erode the objective basis supporting the reprimand issued by Nowland. Nor does the fact that Christie had an office near Nowland's, without more, demonstrate that Nowland's decision to terminate Valle six months after Christie resigned was the result of unlawful discrimination.

Although Valle took issue with Nowland's assessment of his language difficulty and its effect on his job performance, Valle conceded in his deposition testimony that Nowland had not personally made any derogatory ethnic slurs, thereby retracting his allegation to that effect in his original petition for damages. *Id.* at 159–60. This is further supported by Valle's statement of facts, wherein he concedes, *inter alia*, that "Nowland did not personally make any derogatory ethnic slurs directed at Valle." Pl.'s Item. of Facts, ¶ 16. Moreover, Valle's argument that Nowland must have discriminated against him because he tolerated Christie's conduct, *see, e.g., id.*, at 72, is pure speculation. This argument is further eroded because Nowland's decision to terminate Valle was made at a time when Christie was no longer working for Johnson Controls. Therefore, to the extent that Valle's allegations depend on Christie's comments and influence on Nowland or others, the Court finds that no genuine issue of material fact remains for the trier of fact.

Nor does the Court find substantial evidence in support of Valle's argument that Johnson Controls' reasons for Valle's dismissal were merely pretextual. In *Woods v. Friction Materials, Inc.*, 30 F.3d 255 (1st Cir.1994), cited by *Rhodes, supra*, Jimmie Woods, a 54–year–old handicapped, African–American male was not rehired for a supervisory position following his termination after exhaustion of medical leave. Woods brought an action against his former employer alleging race, age, and handicap discrimination in violation of federal law and state law. The supervisory positions were subsequently filled by four younger, nonhandicapped, caucasian males. *Id.* at 257–58. The employer contended that Woods was not qualified to hold a supervisory position in the new and retooled facility, which had evolved from a relatively simple operation to a complex manufacturing system. *Id.* at 261. The employer further contended that, in the alternative, even if Woods was found to be minimally qualified, that he was not as qualified as those ultimately hired. *Id.*

In support of the employer's argument that Woods was not as qualified as other individuals, the employer introduced the affidavits of employees who interviewed the other applicants, i.e., the top managerial officer, the personnel manager and two production superintendents. *Id.* The employer further attached a copy of an undated and unsigned evaluation that had never been shared with Woods because of his accident and subsequent inability to return to work. *Id.* In that evaluation, the top managerial officer and Woods' direct supervisor rated Woods' overall performance in the second to lowest category, while awarding Woods the lowest grade with regard to enforcement of company policies, acceptance of responsibility, and decision-making. *Id.* In light of this evaluation, management intended to place Woods on probationary status prior to his accident. *Id.* at 261–62. Based on such evidence, together with information obtained during interviews, Woods was found by the manageri-

---

8. "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995). By contrast, decisions that have some bearing on subsequent adverse employment decisions are not tangential.

al personnel to be an unacceptable candidate for a foreman position because he had the poorest supervisory skills of all those interviewed and was less qualified than the other applicants. *Id.* at 262. On these facts, the First Circuit held that the employer "successfully articulated non-discriminatory reasons for not hiring Woods, and therefore carried its burden of production." *Id.*

Although the facts in this case differ from those in *Rhodes,* the same principles apply. Johnson Controls has offered a valid, non-discriminatory explanation for Valle's discharge, i.e., that he was part of a reduction in force in which employees were laid off based on their performance records. The performance records in this case are well documented and support Johnson Controls' explanation. Valle was thus required to produce sufficient evidence from which a reasonable trier of fact could conclude that Johnson Controls' explanation was pretextual. *See Walther v. Lone Star Gas Co.,* 952 F.2d 119 (5th Cir.1992) (affirming judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50). Valle fails to show that Nowland's explanation that he was terminated based upon an appraisal of legitimate performance factors was only a pretext for unlawful discrimination. As noted in *Walther,* an ADEA case,

> [The plaintiff] produced evidence that he was laid off while younger, less qualified employees were retained and transferred or promoted to positions similar to his own. Of course, the issue is not whether [the plaintiff] or the retained employees were better qualified. *An employer is entitled to make that decision for itself.* "The ADEA was not intended to be a vehicle for judicial *second guessing* of business decisions, nor was it intended to transform the courts into personnel managers." *Thornbrough,* 760 F.2d at 647. Nevertheless, a plaintiff can take his case to [the trier of fact] with evidence that he was *clearly better qualified than younger employees who were retained. Id.*

*Id.* at 123 (emphasis added).

Valle does not refute that a reduction in work force was required. Rather, Valle argues only that he should have been retained.

The record shows that Valle was generally performing adequately, and in some instances performed more than proficiently on tasks assigned to him. Substantial evidence also exists, however, that the employees retained by Johnson Controls, i.e., Williams and Murray, were more qualified. *See* Defs.' Mot. for Summ. J., Exhs. C–2; F–2, F–3, F–4; *see Molnar,* 986 F.2d at 119. Valle's attempt to downplay his language difficulty, formally identified nearly a year before his termination, is not supported by the record. *See Molnar,* 986 F.2d at 119 (rejecting similar argument that communication skills, previously noted in performance review, were not a problem). To the contrary, Nowland testified, and Valle does not refute, that Adams had spent over forty hours rewriting a report "to get it in acceptable shape to turn into NASA." Defs.' Mot. for Summ. J., Exh. B, p. 78. Whether technical writing constituted 10%, 20%, or 30% of his job, Valle clearly fails to show that written communication skills were not a key requirement in his job, especially in light of Johnson Controls' efforts to improve the quality of its contracted engineering services. Moreover, the fact that communication was not used in the previous assessment pursuant to the first work force reduction does not, without more, show pretext. It is undisputed that communication had been a performance factor used in previous appraisals of Valle and others. *See, e.g.,* Exh. A–2 (Valle: "Needs significant improvement in written communication, including report writing," July 1992); Exh. F–3 (Williams: "communicates clearly and effectively," July 1993); Exh. F–4 (Valle: "Mr. Valle's overall abilities are somewhat hampered by a less than effective command of the English language, specifically with respect to writing," July 1993).

■ In addition to technical writing, the Court finds that Valle's relative qualifications were clearly lacking in other respects, including his failure to obtain professional certifications and make significant steps toward upgrading his skills. That funding was not initially provided to educate Valle in written English did not prevent Valle from making independent efforts to upgrade this impediment. In any event, whether Valle's individ-

ual efforts to improve his writing skills would have made some difference in Johnson Controls' comparative appraisal need not be determined. Looking to the record as a whole, the Court finds that this is not a case where Valle has shown that he was clearly *more* qualified than Williams or Murray. As noted in *Walther*, on these facts the Court need not second guess the business decision made by Johnson Controls when it decided to discharge Valle. That Johnson Controls initially made some effort to accommodate Valle's technical writing problems did not prevent Johnson Controls from reevaluating Valle's relative capabilities in the event of an additional reduction in force. To rule otherwise on these facts would exceed the scope of protections afforded by Title VII. Nor was Johnson Controls required to consider seniority when making the reductions in force. *See Williams v. General Motors Corp.*, 656 F.2d 120, 130–31 n. 17 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).[9] Nor does Valle present evidence of adverse employment decisions with regard to other employees that tends to show unlawful discrimination in Valle's case.

The Court further finds no substantial support for Valle's argument that Knight and Wanslow "custom-tailored" the matrix in an effort to eliminate Valle. Pl.'s Opp. to Defs.' Mot. for Summ. J., at 9–10. Valle paraphrases Knight's testimony incorrectly by contending that Knight was "furious" *with him. Id.* at 11. Valle relies on such testimony to show that Knight intended to discriminate unlawfully against him. The tenor of Knight's testimony, however, was that he (Knight) was upset because he could not consider the remaining engineers according to their qualifications. Defs.' Mot. for Summ. J., Exh. C, pp. 31–32, 38. That Knight was upset because he had reason to believe, as shown by the record, that Valle was less qualified does not show, without more, a discriminatory motive or pretext. Furthermore, Valle's attempt to make distinctions with regard to his specific job experience amounts to a request that the Court second guess the soundness of

Nowland's business decision. For example, Valle contends that pretext is evident because his structural engineering capabilities were found to be "unobserved" by Knight. Pl.'s Opp. to Defs.' Mot. for Summ. J., at 10. Williams was ranked unobserved, however, in two areas: structural engineering and architectural engineering. Defs.' Mot. for Summ. J., Exh. C–1. Johnson Controls contends that all engineers considered for the second work force reduction were supervised by Knight for the same amount of time and were thus equally at risk on this factor. *See* Defs.' Reply to Pl.'s Opp. to Mot. for Summ. J., pp. 4–5; Defs.' Mot. for Summ. J., Exh. F, ¶ 20. Although Valle attempts to emphasize his expertise in structural engineering, Adams had previously advised Valle that he needed improvement in this area. Defs.' Mot. for Summ. J., Exh. A–1. The record does not reflect any change in this assessment. In light of the record, the Court finds that Valle does not show that the assessment by Knight and Wanslow was fundamentally unsound and a pretext for discrimination. Alternatively, the Court finds that, because the record shows that Valle was not *clearly* the most qualified engineer—without regard to the matrix test used by Knight, Wanslow, and Nowland—the Court finds that Valle's attempt to challenge the analytical soundness of the matrix test does not amount to substantial evidence of pretext. The Court therefore need not address Valle's other arguments challenging the matrix.

Nor does Valle's reference to statements or testimony by his coworkers raise a genuine issue of material fact on the issue of pretext. Valle contends that he was offered a job in another division at Johnson Controls, but that he was prevented from taking the job. Pl.'s Opp. to Defs.' Mot. for Summ. J., at 14. In support thereof, he refers to testimony by Seghers that Valle had asked him about employment in the maintenance engineering division, that there was plenty of work for Valle, but that Johnson Controls hired more expensive part-time help to do the work Valle could have done. *Id.* The

9. Johnson Controls contends that, even if seniority were considered, both Williams and Murray would have been ranked higher than Valle. Defs.' Mem. in Supp. of Mot. for Summ.J., pp.

20–21. Based on the date of Valle's regular employment, this assertion stands unrefuted in the record. Defs.' Mot. for Summ.J., Exh. F, ¶ 23.

Court finds that such testimony, without more, does not constitute substantial evidence of pretext. Valle fails to identify any other record evidence in support of this argument.[10]

Valle further contends that, after discharging Valle, Johnson Controls "soon thereafter rehired Valle's tormentor Alex Christie to a job Valle was better qualified for." Pl.'s Item. of Facts, ¶ 29. This argument is conclusional and does not show substantial evidence of discrimination. Valle does not demonstrate objective facts showing that he was better qualified for the job. Christie testified, and Valle does not refute, that he was hired by Nowland because he was certified for handling asbestos, which was required in an asbestos abatement project. Defs.' Mot. for Summ. J., Exh. E, p. 92. Christie testified that, although he worked part time beginning in March 1994, he did not work full-time for Johnson Controls until July 1994. *Id.* at 91–92. These facts do not demonstrate a genuine issue whether Valle's termination was pretextual.

■ Because Valle has failed to produce substantial evidence in support of his allegations, whether initially or upon rebuttal, that he was terminated on the basis of unlawful discrimination, the Court follows the general rule that a substantially unsupported allegation of discrimination will not defeat an otherwise properly supported motion for summary judgment. *See, e.g., Molnar,* 986 F.2d at 117–18. Title VII mandates equality, not preference, for protected individuals, and thus does not require an employer to give preferential treatment to a disgruntled employee just to avoid a lawsuit. *Cf. DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 593 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995) (Title VII's prohibition against sexual harassment mandates equality not preference for women). Because Johnson Controls has established, and Valle does not refute, that Valle was terminated for legitimate,

non-discriminatory reasons, the Court finds that his Title VII and section 1981 claims fail as a matter of law.

## II. *Objections to Magistrate Judge's Ruling*

■ The plaintiff challenges the ruling by Magistrate Judge John M. Roper, denying his motion for leave to file a third amended complaint to include a claim under the ADEA. An order by a magistrate judge on a nondispositive matter may be modified or set aside only if "clearly erroneous or contrary to law." FED.R.CIV.P. 72(a). Because Judge Roper's ruling effectively disposed of Valle's ADEA claims, however, the Court affords plenary review to that determination.

■ In their opposition to Valle's motion for leave to file a third amended complaint adding the ADEA claim, the defendants contended, *inter alia,* that this claim is barred by the 90–day statute of limitations. As noted in *Rhodes,* the ADEA prohibits the unlawful discharge of any individual because of such individual's age. *Rhodes,* 75 F.3d at 992; see 29 U.S.C. § 623(a)(1) (1988). Congress provides the following:

> If a charge filed with the Commission under this chapter is dismissed or the proceedings of the Commission are otherwise terminated by the Commission, the Commission shall notify the person aggrieved. A civil action *may be brought* under this section by a person defined in section 630(a) of this title against the respondent named in the charge *within 90 days after the date of the receipt of such notice.*

29 U.S.C. § 626(e) (as amended by Pub.L. 102–66, Title I, § 115, Nov. 21, 1991, 105 Stat. 1079) (West Supp.1995) (emphasis added). "[T]he legislative history demonstrates that the purpose of the 1991 amendment to § 626(e) was to create a ninety-day window within which plaintiffs must file suit under the ADEA or lose their right to do so." *St. Louis v. Texas Worker's Compensation*

---

10. The record shows that following the time Valle was initially on notice of his termination in March 1993 (which was later rescinded) and working on his final projects, he was interested in working for Roy Wright in another division. Although there is a factual dispute to what extent

Nowland opposed a transfer, the record reflects that such opposition, if any, was based on operational concerns because Valle's work was being divided between the divisions. Defs.' Mot. for Summ.J., Exh. A, pp. 107–12; Exh. B, pp. 81–84.

**1420**

*Comm'n,* 65 F.3d 43, 47 (5th Cir.1995) (citation and internal quotation omitted), *petition for cert.* filed (Apr. 26, 1996) (No. 95–8803).

Johnson Controls contends, and Valle concedes, that he received his right-to-sue letter in February 1995. *See* Pl.'s Obj. to Magistrate Judge's Ruling Denying Mot. to File Third Amended Compl., Exh. 7 (letter dated 2/3/95). Nonetheless, Valle argues that the time-barred ADEA claims should relate back to the time the Title VII complaint was filed in April 1995. Although a different result might lie if the issue involved an amendment adding new defendants, *cf. Vakharia v. Swedish Covenant Hosp.,* 824 F.Supp. 769, 773 (N.D.Ill.1993) (time-barred Title VII claims in amended complaint adding new defendants do not relate back to time of original filing), the federal rules provide that "when the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading," the amendment "relates back to the date of the original pleading." FED. R.CIV.P. 15(c). In *Hayes v. Candle Corp. of America,* 1989 WL 6493 (N.D.Ill., Jan. 25, 1989), the court held that, "[b]ecause plaintiff's original complaint stated a cause of action for age discrimination, and his ADEA claim arose out of the same conduct upon which plaintiff based his original Title VII claim, plaintiff's second amended complaint relates back as a matter of law." *Id.* at *1. Although Valle's original complaint did not state a cause of action under the ADEA specifically, the ADEA claims were in fact considered by the EEOC. *Cf. Brinkworth v. State Dept. of Public Health,* 1996 WL 6596, *6–7 (N.D.Ill., Jan. 5, 1996) (court must reasonably be able to infer from the facts asserted in the amended complaint that claims in the amended complaint are reasonably related to the allegations filed in an EEOC charge, or growing out of such allegations). Therefore, without deciding whether the motion for leave to file the amended complaint was itself timely, the Court.finds only that, assuming the motion were granted, the date of the ADEA claims should relate back to the date of the original filing. This, however, does not end the inquiry.

The issue remains whether the magistrate judge erred in denying Valle's motion to amend on grounds of untimeliness. If Valle's motion to amend was properly denied as untimely, his putative ADEA claims, depending solely on such an amendment, would be barred. The defendants contend that Valle did not comply with the court-imposed deadline for amending the pleadings. On October 18, 1995, the Court entered an order under the Case Management Plan requiring that amendments in the pleadings be made "on or before November 1, 1995." As noted by the defendants, Valle's argument that he learned about the ADEA claim only through information obtained during discovery is disingenuous in light of Valle's ADEA claims previously asserted in his EEOC charge. Nor does Valle show good cause for failing to adequately plead a cause of action under the ADEA in his original and second amended complaint. An ADEA action is by design of Congress separate and distinct from a Title VII action. *See Leon W. Luce v. John H. Dalton, Secretary of Navy,* 166 F.R.D. 457, 461 (S.D.Cal.1996); *James v. KID Broadcasting Corp.,* 559 F.Supp. 1153 (D.Idaho 1983). To the extent that Valle argues that the delay was in part a consequence of obtaining new counsel, the Court concurs with Judge Roper's determination that the defendants would be unduly prejudiced by allowing an amendment adding the ADEA claims. In light of the late stage at which the motion to amend was filed, which occurred following the Court-imposed deadline, the Court finds that Judge Roper properly denied Valle's motion for leave to file a third amended complaint.

### III. *Valle's Putative ADEA Claim is Meritless*

Alternatively, in an abundance of caution, assuming *arguendo* Valle should have been permitted to file an amended complaint adding the ADEA claims, the Court finds that he cannot prevail on such claims. To establish a *prima facie* case of discrimination on the basis of age, the plaintiff must demonstrate the following: "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of the discharge; and (4) he was either i) replaced

by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Rhodes*, 75 F.3d at 992 (citation and internal quotation omitted). As set forth above, the law under Title VII regarding the shifting burdens of proof, discussed above, applies to determinations regarding ADEA claims. *See id.*[11]

There is case authority suggesting that, in cases involving a reduction of work force, the plaintiff's burden in establishing a *prima facie* case may well be greater. *See, e.g., Barnes,* 896 F.2d at 1464–65; *Cherry v. Thermo Electron Corp.,* 800 F.Supp. 508, 512 (E.D.Mich.1992) ("In a reduction in force case, a plaintiff must present additional direct, circumstantial or statistical evidence that age was a factor in his termination in order to establish a prima facie case"). Furthermore, "[i]f age does not motivate the employer's decision, then a 'discharge may well be unfair or even unlawful yet not be evidence of age bias under the ADEA.'" *Rhodes,* 75 F.3d at 994 (citing *Moore v. Eli Lilly & Co.,* 990 F.2d 812, 819 (5th Cir.), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993)). "To sustain a finding of discrimination, circumstantial evidence must be such as to allow a rational factfinder to make a reasonable inference that age was a determinative reason for the employment decision." *Rhodes,* 75 F.3d at 994. This is not such a case.

■ In Valle's statement of facts, he contends, *inter alia,* that "Nowland did make derogatory comments directed at Valle's age." Pl.'s Item. of Facts, ¶ 16. In support thereof, Valle refers to Nowland's admitted comments regarding his ability to handle environmental engineering projects. Valle testified that, when he approached Nowland and offered his services in environmental projects, Nowland allegedly commented, "Yeah, when I went to college ... I learn a little bit of computer, but now, at this point in time, I find out that my computer knowledge is obsolete because the technology [has] advance[d] so much." Defs.' Mot. for Summ. J., Exh. A, at 161. Valle testified that when he asked Nowland what he meant, he replied

that the same would be the case with Valle's environmental knowledge. *Id.* The Court finds that the statements by Nowland are not substantial evidence of discrimination on the basis of age. Valle has not refuted Nowland's deposition testimony that, although Williams had been taking up-to-date environmental engineering courses, he believed Valle had not handled environmental projects since he began working with Johnson Controls and probably had not worked on such a project since 1987. *Id.,* Exh. B, p. 88. The Court finds no reasonable inference from the record that Nowland's comments were made in bad faith or with discriminatory animus.

■ Most importantly, Valle flags a comment attributed by Seghers to Charles Pittman, a member of the company's evaluation board, who allegedly explained to him that certain individuals, including Valle, were being fired because "[y]ou can't teach an old dog new tricks. You've got to roll over those puppies." Pl.'s Opp. to Defs.' Mot. for Summ. J., Exh. 27, at 33. Although the fact that a member of the evaluation board allegedly made the comment subjects the statement to greater scrutiny, *cf. Jones v. Unisys Corp.,* 54 F.3d 624 (10th Cir.1995) (isolated comment that "it's about time we unloaded some of this old driftwood" by someone not in a decision-making position does not establish intent to discriminate), in light of the record as a whole, Pittman's comment does not, without more, show discrimination on the basis of age with regard to Valle. Nor does the comment viewed in light of other evidence raise a substantial issue of material fact. *See Rhodes,* 75 F.3d at 994; *Woods,* 30 F.3d at 261–62.

Although not controlling, the record demonstrates, and Valle does not refute, that he occasionally flaunted his 30 years of work experience as a basis to ignore or reject engineering codes, standards, and procedures. For example, Knight, Valle's former supervisor, discovered that Valle had designed a flush valve urinal with a half-inch water line instead of a three-quarter-inch line required by the standard plumbing code. Knight testified that, when he brought the

---

11. *See* note 6, *supra.*

error to Valle's attention, he became very argumentative, stating that "he had been doing such work for thirty years and did not need a book to tell him how to do it." Defs.' Mot. for Summ. J., Exh. C, pp. 60–63. Knight further testified that, even after Wanslow confirmed that the fixture required a three-quarter-inch line, Valle "seemed so adamant he wasn't going to change." *Id.* at 69. Knight believed, for good reason, that Valle's "don't care" attitude about the engineering codes because he had thirty years of experience was "above imagination." *Id.* at 74. Kennedy, Valle's first supervisor, testified that on one occasion Valle had insisted that a column did not need to be braced in accordance with the American Institute of Steel Construction standards. Kennedy further testified that, when he confronted Valle on the need for him to follow the code, "[a]s best as I can recall, [Valle] said something like, 'I know how to design a building. I don't need to follow the code.'" *Id.*, Exh. D, pp. 13–14.

■■■ The record thus shows that Valle relied on his age and experience as both a shield and sword in the workplace. Of course, experience and age may well be two entirely different propositions because a younger employee might in some cases have more experience—or education—than an older one. In any event, as in Title VII cases, it is clear that the purpose of the ADEA is to afford senior workers a level playing field where they are evaluated fairly without regard to their age. This, however, does not entitle Valle to preferential treatment. *See DeAngelis*, 51 F.3d at 593.

The Court further observes that Valle's allegation of discrimination on the basis of age by referring to Pittman's "old dog" comment is somewhat disingenuous when he invited such commentary by his practice of using his thirty years of experience in defense of clearly untenable positions. Moreover, Valle conceded in his deposition testimony with unusual frankness that the EIT exam, an objective assessment tool, was "a hard test to take for an old-timer." Defs.'

Mot. for Summ. J., Exh. A, p. 129. Nor does Valle's allegation that younger employees excluded him from "boys club" social interactions in the workplace raise a genuine issue of fact in light of the record as a whole. Valle does not address to what extent the targeted individuals were more qualified in light of professional certification or education in the emerging technologies. Moreover, there is ample evidence in the record to show that Valle did not welcome the peer review process, in part because he did not get along well with those who scrutinized or critiqued his work. His defensiveness was also evident when reviewed unfavorably by his supervisors. Presumably, there may well have been personal animosity between Valle and such individuals. Personal animosity, however, without more, does not support a finding of discrimination on the basis of age, even if animosity exists between an employee and his supervisor. *See Molnar*, 986 F.2d at 119.

Finally, even assuming *arguendo* that Pittman's comment was directed at Valle, the Court finds that the comment, viewed in light of the record as whole, does not overcome Johnson Controls' legitimate non-discriminatory reasons for terminating him. To the contrary, the Court finds substantial support in the record that considerations of merit and ability, not age, was the primary basis upon which Johnson Controls reduced its work force. *Cf. Laugesen v. Anaconda Co.*, 510 F.2d 307, 313 (6th Cir.1975) (statements, read in context with other comments, allowed an inference that plaintiff had become complacent, reflecting considerations of merit and ability, rather than age). The record further shows that the termination of other engineers in the work force reduction was based upon merit and ability.[12] The Court finds that the record provides substantial and unrefuted evidence that Valle's lower ratings which led to his discharge during the second reduction were objectively based and not a pretext to cover up discrimination on the basis of his age. As set forth in greater detail above, Valle's argument to the contrary, given substantial evidence presented

---

12. For example, the record reflects that, in addition to Mollyneux, Fred Vaughn, a mechanical engineer with a score of 56, and Len Soellers, an electrical engineer with a score of 48, were both terminated based on a their lower scores relative to their peers. Defs. Mot. for Summ.J., Exh. F, ¶¶ 15–16.

by Johnson Controls, is unduly speculative. *Cf. Brown,* 82 F.3d 651, 657–58 (reasoning that guesswork and speculation simply cannot serve as a basis for sending a case to the trier of fact). Moreover, as with his Title VII and section 1981 claims, the Court finds that Valle's argument that his discharge was the result of a last-minute matrix fabricated by individuals discriminating against him on the basis of age must fail. The Court therefore finds that Valle's prospective ADEA claim fails on its merits.

For the above reasons, it follows that, even if Judge Roper had permitted Valle to amend his complaint to add his ADEA claim, the amendment "would do nothing but prolong the inevitable." *Jacquez v. Procunier,* 801 F.2d 789, 793 (5th Cir.1986). Therefore, setting aside the procedural issue of timeliness, the Court finds that the "ends of justice" would not have been served by permitting Valle an opportunity to amend his complaint yet another time to include an ADEA claim. *See* FED.R.CIV.P. 15(a).

### IV. *Breach of Contract Claim*

In his second amended complaint, Valle alleges that he is entitled to compensatory and punitive damages because Johnson Controls wrongfully breached a contract of employment, entered into by the parties following Valle's first EEOC charge filed in August 1993. Valle further contends that damages are warranted under the Uniform Commercial Code and/or common law. Johnson Controls has filed a motion to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the Court considers matters outside the pleadings, the Court reviews the motion pursuant to Rule 56. *See* FED.R.CIV.P. 12(b)(6); *Burns–Toole v. Byrne,* 11 F.3d 1270, 1273–75 (5th Cir.), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2680, 129 L.Ed.2d 814 (1994).

Federal courts apply federal common law, not state law, to enforce an oral settlement agreement made by private parties during the pendency of an employment discrimination lawsuit. *See, e.g., E.E.O.C. v. Safeway Stores, Inc.,* 714 F.2d 567 (5th Cir. 1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2384, 81 L.Ed.2d 343 (1984); *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207, 1208–09 (5th Cir.1981) (rejecting argument that state law applies to render unenforceable a Title VII oral settlement agreement because it was not reduced to writing as required by the Louisiana Civil Code)[13]; *accord DiMartino v. City of Hartford,* 636 F.Supp. 1241, 1249 (D.Conn.1986) (federal law determines validity of settlements under the ADEA); *but see Morris v. City of Hobart,* 39 F.3d 1105 (10th Cir.1994) (an action for breach of contract arising out of a private settlement of a Title VII claim does not arise under federal law), *cert. denied,* —— U.S. ——, 115 S.Ct. 1960, 131 L.Ed.2d 852 (1995); *American Intern. Enterprises, Inc. v. F.D.I.C.,* 3 F.3d 1263 (9th Cir.1993) (applying California statute of frauds in oral agreement between FSLIC and a licensed California broker).

In this case, the alleged settlement occurred before Valle had filed a lawsuit. Assuming *arguendo* that federal common law applies given the facts in this case, " 'federal courts are free to apply the traditional common law techniques of decision and to draw upon all the sources of common law in cases such as the present' " so long as the particular rule selected appropriately "effectuate[s] the policy of the governing Act." *DiMartino,* 636 F.Supp. at 1249 (citing *D'Oench Duhme & Co. v. F.D.I.C.,* 315 U.S. 447, 472, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (Jackson, J., concurring). "Historically, federal courts have consistently applied general principles of contract in determining the validity of the release of rights under federal statutes dealing with the employer-employee relationship." *DiMartino,* 636 F.Supp. at 1249 (cita-

---

**13.** The Fifth Circuit reasoned as follows:

No significant state interest would be served by absorbing state law as the rule of decision governing Title VII settlement agreements. On the other hand, Louisiana's requirement that settlement agreements be reduced to writing might hamper a significant federal interest, since Congress has mandated a policy of encouraging voluntary settlement of Title VII claims.

*Id.* at 1209 (citing 42 U.S.C. § 2000e–5(b); *U.S. v. Allegheny–Ludlum Industries, Inc.,* 517 F.2d 826, 846–47 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976)).

tions omitted). The Court may look to the record evidence as a whole to determine whether an alleged agreement is enforceable under principles of common law and in light of the policies of the governing Act. *Maynard v. Durham & S. Ry. Co.*, 365 U.S. 160, 81 S.Ct. 561, 5 L.Ed.2d 486 (1961).

Nowland's letter dated August 20, 1993, rescinded the portion of his previous letter, dated March 10, 1993, stating that his employment would be terminated in the future because of a lack of writing skills. Nowland was still on notice that improvement was required, and additional time was afforded to Nowland so that he could improve his writing skills. No period of time is stated, except "I look forward to working with you in the future." Defs.' Mot. for Summ. J., Exh. A–5. Valle testified that, although a technical writing course was offered at Stennis Space Center in December 1993, he did not take the course. *Id.*, Exh. A, p. 124. It does appear, however, that Valle had submitted a "request for training." Pl.'s Opp. to Defs.' Mot. for Summ. J., Exh. 33. Approximately six months passed from the time Valle's termination was rescinded and the date he was terminated under the second reduction of force.

Valle's contention that a contract existed is based upon his understanding that he would be retained until Johnson Controls' then current contract with NASA was completed. When that time was, however, was uncertain. Valle's expectation of continuing employment was based on the alleged statements of Johnson Controls' managerial staff. Valle testified, *inter alia*, that Jack Seabold had assured him that he (Valle) was to have job security as long as Johnson Controls had a contract at NASA. *Id.*, Exh. A, at 70. Valle later testified that Embry had made similar assurances. *Id.* at 172. Although Valle testified that it was his understanding that the NASA contract was renewed at approximately five-year intervals, he further testified that he believed that, considering his age and proximity to retirement, he was promised a job for life, which he defined as "ten years." *Id.* at 172–73. By contrast, Nowland attests, and Valle does not refute with substantial evidence, that Johnson Controls' contract

with NASA provides for successive one-year renewal periods until 1997 and that the scope of services to be performed vary each year in accordance with the work requested by NASA and Congressional budget appropriations. *Id.*, Exh. F, ¶ 3. When questioned regarding the issue of Valle's job security, Nowland testified that "[t]he only thing I recall was that [Valle] was going to, you know, return to the normal employee or the permanent status," which Nowland defined to be essentially employment "at will." *Id.*, Exh. B, pp. 87–88. Nowland further testified that Emory and Humphries had determined that "it was not in the company's interest at the time to have a layoff *if we could avoid it*, and we would go on the record as trying to provide resources and funding to give [Valle], you know, another opportunity to improve." *Id.* at 87 (emphasis added). There is no indication in the record that, prior to issuing his letter of rescission, Nowland—or anyone else at Johnson Controls—knew how deep the imminent work force reductions would be based on NASA's budget appropriations.

Valle submits testimony by other employees, based upon what he allegedly had told them at the time his date of termination was rescinded. Byrd, who had been laid off, testified that it was her job to prepare a five-year plan, that the plan was part of the contract with NASA, and that her "basic understanding" was that Johnson Controls was not offering Valle a job for life, but only "as long as Johnson had a contract with NASA." Pl.'s Opp. to Defs.' Mot. for Summ. J., Exh. 31. Byrd further testified that she and Valle's coworkers were "tickled" that Valle had some kind of security while the rest of them felt "constantly worried about [their] jobs." *Id.* Felix Rivero essentially testified that, although Valle told him his termination had been rescinded, he could not remember whether Valle expected to have a job for life or what length of time was contemplated, "but it obviously has to be with Johnson Controls, while they have the contract." *Id.*, Exh. 30, pp. 17–18. What exactly was meant by Johnson Controls' "contract" with NASA, however, is both unclear and vague. As conceded by Rivero, he was not the person to ask about the details of

Johnson Controls' contract with NASA. *Id.,* Exh. 30, at 18.

██ Under the common law, an employment agreement must contain the formal requirements of óffer, acceptance, and consideration. The general rule is that a contract for employment that is indefinite regarding time of duration, and one in which the employee merely promises to perform services, is terminable at will by either party, without regard to cause. An exception lies, however, when the employee provides additional independent consideration. In such a case, the contract is enforceable even though the employee has the right to terminate at any time. Nonetheless, there still must be an exchange of bargained-for non-illusory promises. *See, e.g., Kunzman v. Enron Corp.,* 902 F.Supp. 882, 906 (N.D.Iowa 1995); *Keenan v. Allan,* 889 F.Supp. 1320, 1356 (E.D.Wash.1995); *Lamaster v. Chicago and Northeast Illinois Dist. Council of Carpenters Apprentice and Trainee Program,* 766 F.Supp. 1497 (N.D.Ill. 1991). As observed by one court, "if adequate independent consideration was exchanged, then in the absence of mutual agreement, the company could only terminate the employee for good cause without incurring liability for its action." *Stack v. Allstate Ins. Co.,* 606 F.Supp. 472, 475 (S.D.Ind.1985) (citation omitted); *cf. Hartle v. Packard Elec., a Div. of General Motors Corp.,* 626 So.2d 106 (Miss.1993) (Mississippi common law); *see also Reiver v. Murdoch & Walsh, P.A.,* 625 F.Supp. 998, 1011–14 (D.Del.1985) (implied covenant of good faith and fair dealing).

██ As set forth above, Valle alleges oral representations were made to him which assured him, at best, lifelong employment, or alternatively, employment for the imprecise duration of Johnson Controls' contract with NASA. Resolving this dispute in a light most favorable to Valle, the Court finds that in exchange for Johnson Controls' promise to continue his employment so that he could obtain additional education, Valle promised to drop his EEOC charge and attend technical writing classes. An employee's agreement to attend an educational program paid for by the employer to meet the qualifications for a job does not generally constitute

adequate consideration to prevent termination at will. *Keenan,* 889 F.Supp. at 1358. The Court finds substantial, unrefuted evidence in the record to show that Valle needed to improve his technical writing skills. By contrast, however, the Court finds that Valle's promise to drop his EEOC claim constitutes adequate independent consideration. Therefore, contrary to Johnson Controls' argument, the Court finds that Valle could be terminated only for just cause before he was afforded an adequate opportunity to improve his skills. *See, e.g., Stack v. Allstate Ins. Co.,* 606 F.Supp. at 475; *Reiver,* 625 F.Supp. at 1011.

██ It is well-established that a legitimate reduction of force during a budgetary shortfall or economic downturn supported by unrefuted, substantial record evidence constitutes just cause for termination as a matter of law. *See Grayson v. American Airlines, Inc.,* 803 F.2d 1097, 1099 (10th Cir.1986); *Gianaculas v. Trans World Airlines, Inc.,* 761 F.2d 1391 (9th Cir.1985); *see also Nora v. Carrier Corp.,* 861 F.2d 457, 461 (6th Cir. 1988) (alternative finding). This is equally true in cases where the dispute is complicated by an employee's additional contention that the reduction in force was a mere pretext for discrimination. *See, e.g., Cherry v. Thermo Electron Corp.,* 800 F.Supp. 508 (E.D.Mich.1992); *Grooms v. Mobay Chemical Corp.,* 861 F.Supp. 497, 504–05, *aff'd,* 993 F.2d 1537 (4th Cir.), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); *Joumas v. Maryland Cas. Co.,* 698 F.Supp. 675, 676–77 (E.D.Mich.1988); *Cox v. Resilient Flooring Division of Congoleum Corporation,* 638 F.Supp. 726, 731–32 (C.D.Cal. 1986). The Court finds that the policy underlying the ADEA and Title VII is not undermined by applying the above rules of common law to the facts of this case. *See DiMartino,* 636 F.Supp. at 1249.

██ The Court finds that Johnson Controls has provided substantial, unrefuted evidence that Valle's termination was based on a fair appraisal of performance factors, not as a mere pretext for discrimination. Because Valle's termination pursuant to the reduction of force was not arbitrary and capricious, the Court finds that he was termi-

nated for just cause. Similarly, that Valle was retained in the first reduction of force does not render his subsequent discharge in the second reduction of force a breach of good faith or fair dealing. Johnson Controls has established, and Valle does not refute, that annually negotiated budgetary appropriations are an integral part of the contractual relationship between Johnson Controls and NASA. As attested to by Nowland, the reductions at issue were necessary to meet NASA's budget appropriations and contractual requirements. Defs.' Mot. for Summ.J., Exh. F, ¶ 19. The Court finds that Valle's expectation that he would be retained at all costs and in all circumstances so long as Johnson Controls had a contract with NASA is meritless. For the above reasons, Valle's breach of contract claim fails as a matter of law.

Alternatively, in light of the expected duration of Valle's employment, and assuming *arguendo* that Mississippi law applies to resolve the contractual dispute, the Court observes the following Mississippi statute of limitations:

§ 15–3–1. Certain contracts to be in writing.

"An action shall not be brought whereby to charge a defendant or other party ... (d) upon any agreement which is not to be performed within the space of fifteen months from the making thereof ..."

MISS.CODE ANN. § 15–3–1(d) (1972). Under this provision, there must be "sufficient written evidence to substantiate the contract." *See Bowers Window and Door Co., Inc. v. Dearman,* 549 So.2d 1309, 1313 (Miss. 1989) (finding that alleged contract of employment to be carried out over a period of 27 months was subject to the statute of frauds). This, however, is not such a case. The Court finds no written document supporting his version of the alleged agreement, i.e., that Johnson Controls promised to employ him for the duration of its contract with NASA, or alternatively, until he retired. Nor does the Court find any equitable concerns sufficient to constitute an exception to the statute of frauds. *See Dearman,* 549 So.2d at 1313. Further, the Court has not uncovered, and Valle has not articulated, any specific provision of the Uniform Commercial Code upon which relief is warranted.

Moreover, assuming *arguendo* that Mississippi's statute of limitations does not bar Valle's claims, the Court finds that no genuine issue of fact remains for the trier of fact. To the extent Nowland's letter may be taken as evidence of an agreement "so indefinite that parol evidence must complete the contract," the agreement would be "treated as an oral contract for statute of limitations purposes." *Sloan v. Taylor Machinery Co.,* 501 So.2d 409, 411 (Miss.1987). In this case, however, parol evidence does not allow a reasonable determination regarding the precise length of time contemplated by the parties. Nor is there any "written agreement [that] furnishes some objective standard by which its terms may be made definite and the contract complete." *Id.* (citation and internal quotation omitted).

Additionally, and again assuming *arguendo* for purposes of analysis that Mississippi's statute of limitations does not bar his claims, the Court finds that, under Mississippi law, Valle's termination pursuant to the second work force reduction was for just cause and did not violate any legally enforceable contractual term or implied covenant of good faith and fair dealing. Because the Court finds no Mississippi Supreme Court case factually and legally on point, the Court looks to *dicta* and persuasive authority. *Laws v. Aetna Finance Co.,* 667 F.Supp. 342, 344–45 (N.D.Miss.1987) (In determining how the Mississippi Supreme Court would decide a disputed issue not expressly ruled upon, federal courts look, *inter alia,* to supreme court *dicta,* general common law, and decisions of other states to which the supreme court would look for guidance in making its decisions).

In *Byrd v. Greene County School Dist.,* 633 So.2d 1018 (Miss.1994), the Mississippi Supreme Court held that the Mississippi legislature determines what constitutes good cause for modifying or terminating a teacher's renewed contract in the event of a work force reduction in light of budgetary shortfalls. *Id.* at 1025. In *Byrd,* the court held that, in the absence of any statutory or contractual authority to so act, the defendant school district's "eleventh-hour" realization of its financial predicament was not good cause for rescission of the plaintiff-teacher's al-

ready renewed contract. *Id.* at 1024–25. The court further observed that, even in jurisdictions where termination of teachers pursuant to a work force reduction would be permitted for "cause," the decision maker still is "not necessarily free from arbitrary decision-making" and "may be called upon to articulate an objective basis for the selection, *specifically for the purpose of verifying that the decision was based on rational and legitimate criteria." Id.* at 1024 (citations and internal quotations omitted; emphasis added).

The Court finds that in the instant case there is no statute or legal premise that puts Valle on equal ground with a school teacher endowed with a renewed contract.[14] Nor was this a case in which Johnson Controls made an eleventh-hour decision regarding staffing. To the contrary, Johnson Controls has shown, and Valle does not refute, that the reductions at issue were communicated in a reasonably prompt manner and in accordance with the customary method of making initial and final staffing determinations. As set forth in the analysis in *Grayson, Gianaculas, Cherry, Grooms, Joumas,* and *Cox, supra,* the Court finds that, given facts unique to this case, the record does not support Valle's argument that his termination was based on arbitrary, capricious, or discriminatory decision making. Nor does Valle present substantial evidence showing that Johnson Controls breached a contract of employment. Accordingly, on this alternative basis, the Court finds that the claims in Valle's second amended complaint fail as a matter of law.

### Conclusion

For the above reasons, the Court finds that Valle's claims against Nowland in his individual capacity are devoid of merit and should be dismissed. The Court further finds that Johnson Controls has established a legitimate, nondiscriminatory reason for Valle's discharge pursuant to the company's second reduction of force in February 1994. Because Valle fails to meet his burden in showing that the reasons given by Johnson Controls were pretextual, the Court finds that his Title VII and section 1981 claims fail as a matter of law. Similarly, the Court finds that the claims in Valle's second amended complaint fail as a matter of law. Additionally, the Court finds that the magistrate judge did not err in denying as untimely Valle's motion for leave to file a third amended complaint to include an ADEA claim. Alternatively, even assuming *arguendo* that the magistrate judge erred, the Court finds that Valle's ADEA claim is devoid of merit and fails as a matter of law. Accordingly, the Court finds that the defendants' motion for summary judgment and motion to dismiss should be granted pursuant to Rule 56. The Court further finds that Valle's motion to set aside the magistrate judge's denial of his motion for leave to file a third amended complaint should be denied. A final order in conformity with and incorporating by reference this opinion shall issue this date.

---

**14.** Moreover, any attempt to read *dicta* in *Byrd* to place them on equal footing, *see id.* ("[t]he premises underlying a contract between a school district and a teacher are indistinguishable from any other employment contract"), is unavailing. The supreme court further observed that "[t]he district promises to employ the teacher *for a given term, subject to the terms of that contract."*

*Id.* (emphasis added). In this case, the record shows that, rather than being fixed upon a definite term of employment, the alleged duration of employment was subject to Valle's shifting and imprecise expectations. In such circumstances, Johnson Controls clearly was not precluded from terminating Valle pursuant to a work force reduction based on rational and legitimate criteria.